WALN, Respondent v. PUTNAM, Appellant

(196 N.W.2d 579)

(File No. 10838. Opinion filed April 20, 1972)

**Herman & Wernke,** Gregory, for defendant and appellant.

**Johnson & Johnson,** Gregory, for plaintiff and respondent.

WINANS, Judge.

The allegations of the complaint state a cause of action in slander. Slander is defined in SDCL 20-11-4, which insofar as this case is concerned is in pertinent part as follows:

> **"Slander defined. —** Slander is a false and unprivileged publication, other than libel, which:
>
> (1) Charges any person with crime * * * ".

The complaint alleges that defendant on or about June 5, 1969, at a meeting of the South Dakota Stock Growers Association held in Sioux Falls, South Dakota, spoke and published within the hearing of all attending members the following false and slanderous words about the plaintiff: "John Waln told me that he stole those (Halligan) cattle and sold them to me."

The complaint alleges further such statement was maliciously made with the desire to injure plaintiff, and as a result plaintiff suffered damages and asks for actual and exemplary damages.

The factual background, somewhat summarized, is necessary for an understanding of the situation existing at the meeting where the alleged slanderous words were said to have been spoken.

It is provided by SDCL 40-18 that the state brand board is composed of three members appointed by the Governor whose names are submitted by the South Dakota Stock Growers Association. SDCL 40-18-9 and 40-18-10 in part provide that the state brand board may employ persons and corporations to carry out the provisions of chapters 40-20 and 40-21 of the Code, under the supervision and control of the board. The board may appoint as an agency for carrying on of livestock inspection work as a non-stock, nonprofit, co-operative corporation of growers of livestock. SDCL 40-18-16 provides that the state brand board shall also have the power and authority to pass rules and regulations relating to the administration of but not inconsistent with the provisions of chapters 40-20 and 40-21 of the Code. The agent of the South Dakota State Brand Board is the South Dakota Stock Growers' Association. A resolution issued by the state brand board of South Dakota having to do with ownership inspection provides for a "hold" of the proceeds of the sale of certain livestock which the brand inspector finds carrying a reported brand which is not the property of consignor and not accompanied by a proper bill of sale, and then in order to obtain the proceeds evidence of owner-ship must be established. All doubtful "holds" shall be presented to the brand committee for final approval.

On June 5, 1969 a brand committee meeting was held in Sioux Falls, South Dakota, attended by at least 40 members of the Stock Growers Association and by others. At this meeting the chairman introduced a couple of "hold" cases concerning the claim of the defendant and Ethel Halligan and Sons. The disposition of the proceeds of the sale of two head of cattle, both of which bore the South Dakota registered brands of Ethel Halligan and Sons and the defendant, L. D. Putnam, was for decision by the board. The

proceeds were being held by the South Dakota State Brand Board. At this meeting the brand committee voted to turn over the proceeds to the Halligans as there was no bill of sale from the Halligans to the defendant Putnam.

The ranches and livestock operations of John Waln, L. D. Putnam and the Halligans are in close proximity in Todd County in the Rosebud country, and in addition, L. D. Putnam, who operates extensively, is also in Bennett County and Nebraska. John Waln is related to Ethel Halligan and a part of the time they pastured their cows and calves together.

On October 30, 1966 the defendant contracted to purchase plaintiff's calves which were delivered November 4, 1966 by the plaintiff to defendant's scales. There were 89 steers and heifers and the plaintiff executed to the defendant a bill of sale and received payment. These were calves which plaintiff had raised, carrying a J/6 brand and with their right ears cropped off. The morning of the delivery and preceding the delivery of these calves, John Waln, assisted by a number of experienced cattlemen, including two of the defendant's hired hands, cut out a number of the Halligan cattle from his herd. After the weighing of the calves at defendant's scales, they were delivered to the corrals at defendant's main ranch in Todd County where they were then or shortly thereafter branded by defendant's hired men.

Plaintiff did not attend the brand committee meeting on June 5, 1969 where the slanderous statements by Mr. Putnam are alleged to have been made, nor were Ethel Halligan and her sons in attendance. The Halligans were represented by Cleveland Bechtold, Deputy Sheriff of Todd and Tripp Counties and also brand inspector for the Stock Growers Association for Todd County. The defendant was present at this meeting. Mr. Bechtold, upon his return from the meeting informed plaintiff of the statements made by Mr. Putnam. The words of the statement claimed to have been made are the basis of the suit. Mr. Putnam denies making any such statement but admits he did make a statement to the Stock Growers Association as to what the plaintiff, John Waln, had told him in reference to these cattle and that the statement which Waln

made to the defendant was the one which the defendant repeated to the Stock Growers Association on June 5, 1969 and further, defendant claims that the statement made by him to the Stock Growers Association concerning the plaintiff is a privileged communication. It is defendant's claim that the sum and substance of the statement which he made at the Stock Growers Association or brand committee meeting was in effect that John Waln had told him "that he sold me eighty nine calves and brought these four calves along with them. That's the statement I made." Further, at the meeting he admitted that he had said that John Waln had admitted to him that he had sold him these cattle. The issue presented by the pleadings is whether the alleged slanderous statement (John Waln told me that he stole those cattle and sold them to me) was made or not, and further if made were they privileged. The trial lasted four days, resulting in a verdict of $12,000 actual and $6,500 exemplary damages for the plaintiff. Judgment was entered thereon January 30, 1970.

█ The plaintiff who is the respondent herein has made objections to what he terms "the untimeliness of these appeal proceedings". It appears from the records that the appeal was perfected on June 2, 1970 and on July 28, 1970 appellant had not then settled the record nor served assignments of error and counsel for plaintiff made a motion to dismiss the appeal. In his brief plaintiff states that no order has been entered on his motion. In this contention plaintiff is in error. There is in this Court an order, dated, signed and filed August 27, 1970, signed by the Presiding Judge, "that the motion to dismiss be and the same is hereby denied". Notice of entry of judgment was mailed to the defendant on February 4, 1970 and the defendant on May 20, 1970 made a motion for judgment notwithstanding the verdict or for a new trial, which motion was denied at a hearing on May 25, 1970. This motion for judgment n. o. v. was 105 days after notice of entry of judgment. SDCL 15-6-50(b) provides in part as follows:

> "Not later than ten days after notice of entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict".

It also provides, "A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative". It is apparent that defendant's motion for judgment n. o. v. came too late. However, SDCL 15-6-59(b) provides in part that a "motion for a new trial stating the grounds thereof may be made at any time within which an appeal lies from any judgment rendered in said action." In the combined motion of the defendant the grounds relied upon by the defendant for a new trial were set forth. SDCL 15-26-2 provides in part as follows:

"An appeal from the judgment must be taken within one hundred twenty days after the judgment shall be signed, attested, filed and written notice of entry thereof shall have been given to the adverse party."

This appeal is from the judgment and it was taken within 120 days. SDCL 15-26-19 is as follows:

"**Orders and determinations of trial court subject to review on appeal from judgment.** — On appeal from a judgment the Supreme Court may review any order, ruling, or determination of the trial court, including an order denying a new trial, and whether any such order, ruling, or determination is made before or after judgment involving the merits and necessarily affecting the judgment and appearing upon the record."

In Fales v. Kaupp, 83 S.D. 487, 161 N.W.2d 855, this Court held,

"The order denying defendants' motion for a new trial is not appealable, SDC 1960 Supp. 33.0701, but the propriety of that order is reviewable on an appeal from the judgment. SDC 1960 Supp. 33.0710. State Highway Commission v. Madsen, 80 S.D. 120, 119 N.W.2d 924. Accordingly, we will treat that portion of the notice which purports to appeal from the denial of a new trial as surplusage."

The defendant has plead privilege. The section governing privileged communications is SDCL 20-11-5, Pocket Supplement, and is as follows:

**"Privileged communications — Malice not inferred from publication. —** A privileged communication is one made:

(1) In the proper discharge of an official duty;

(2) In any legislative or judicial proceeding, or in any other official proceeding authorized by law;

(3) In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information;

(4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding or of anything said in the course thereof.

In the cases provided for in subdivisions (3) and (4) of this section, malice is not inferred from the communication or publication."

In the case of Williams v. Hobbs, 81 S.D. 79, 131 N.W.2d 85, an action for libel, this Court held:

"The question whether the verdict of the jury is supported by competent and substantial evidence fairly tending to sustain the verdict is a question of law to be determined by this court. 5 Am.Jur.2d Appeal and Error, § 831, p. 273."

■ The defendant has in his appeal claimed both absolute and qualified privilege. The absolute privileges are contained in (1) and (2) above. Assuming that the defendant made the state· ment attributed to him by the plaintiff, we do not believe that this case is at all similar to Hackworth v. Larson, 1969, 83 S.D. 674, 165 N.W.2d 705, or Brech v. Seacat, 1969, 84 S.D. 264, 170 N.W.2d 348. In the Hackworth case we held:

"Defendant Larson was a constitutional officer and the incident in question involved her duty of hiring and discharging the personnel of her office. Clearly, the release which she issued had a real relation to the general matters committed by law to her control and supervision. It has long been recognized that a defamatory statement issued by a public official in the proper discharge of his official duties is absolutely privileged. This is the purport of SDC 47.0503 which provides:

'A privileged communication is one made:

(1) In the proper discharge of an official duty;

(2) In any legislative or judicial proceeding, or in any other official proceeding authorized by law.'

See also Restatement of the Law, Torts, § 591; Harper & James, Law of Torts, p. 429; Prosser, Law of Torts, 3d Ed., § 109. The defense of absolute privilege or immunity under the law of defamation avoids all liability. In issuing the press release in question defendant Larson enjoyed absolute privilege even if it contained false or inaccurate statements, which we need not determine. Consequently, discovery concerning the truth of the release or her purpose and state of mind in issuing it would be meaningless."

In the Hackworth case we held that the press release is an essential activity of public officials if within the outer perimeter of their

line of duty and cited many cases to uphold this theory. This would not apply to Putnam. If the absolute privilege applies at all to Putnam it would be under that part of SDCL 20-11-5(2) as follows: "or in any other official proceeding authorized by law".

 In the case of McMann v. Wadler, 189 Cal.App.2d 124, 11 Cal.Rptr. 37, before the District Court of Appeals, 3rd Dist., that Court held:

> "Appellants first contend that a meeting of the board of directors of a nonprofit corporation to remove a director is an 'official proceeding authorized by law' under section 47, subsection 2(3) of the Civil Code, and therefore that the communication in issue here was absolutely privileged. We feel that this contention is without merit. Surely it was not the legislative intent to grant an absolute privilege for every defamatory utterance made in every lawful meeting. We are persuaded that the 'official proceeding' embraced in the purview of the statute is that which resembles judicial and legislative proceedings, such as transactions of administrative boards and quasi-judicial and quasi-legislative proceedings, not a meeting of a board of directors of a nonprofit corporation or the like. See Prosser on Torts, 2d ed., Sec. 95; Gunsul v. Ray, 6 Cal.App.2d 528, 530, 45 P.2d 248."

The defendant then argues that the communication or statement attributed to the defendant by the plaintiff is at least qualifiedly privileged, that is under SDCL 20-11-5(3), Pocket Supplement. The difference between a qualified and an absolute privilege is that malice destroys the qualified privilege but does not affect the latter. McLean v. Merriman, 42 S.D. 394, 175 N.W. 878. "Where a qualified privilege exists, the plaintiff has the burden of proving express malice, or malice in fact. Parr v. Warren-Lamb Lumber Co., 58 S.D. 389, 236 N.W. 291, and cases cited therein. Plaintiff must prove that the libelous statements, although privileged, were not published pursuant to the right and duty which created the privilege, but from some other motive. 33 Am.Jur., Libel and Slander, § 113, p. 116". Williams v. Hobbs, supra. However, this

Court is also committed to the rule: "A defendant cannot come under the protection of the rule of a qualified privilege and will not be heard to say that he acted in good faith if he has given utterance to a slanderous communication with unnecessary publicity. A slanderous statement, however, incidentally overheard by a bystander does not remove the communication from the protection of the privilege; this, in itself, does not indicate a malicious intent. Fahr v. Hayes, 50 N.J.L. 275, 13 A. 261; McKenzie v. Wm. J. Burns Detective Agency, 149 Minn. 311, 183 N.W. 516. See, also, note, Ann.Cas.1917E, 699." Parr v. Warren-Lamb Lumber Co., supra.

■ ■ It is our opinion that if the defendant gave utterance to the words he is charged by the plaintiff with having made, he has given unnecessary publicity to a slanderous statement. Putnam, by his own testimony attended the meeting at Sioux Falls for the purpose of collecting some pasture bill which he claimed due him for pasturing the two head of cattle on the "hold". He was not entitled to any "hold" proceeds if he had purchased stolen cattle from Waln. The theft of the cattle, if stolen, and their subsequent sale to him would not have created ownership in him entitling him to either the cattle or the proceeds upon their sale. The charge he is alleged to have made and given publicity to before a public meeting attended by a large number of people, not all of whom were members of the Stock Growers Association would be a slanderous statement because it would charge the plaintiff with the crime of larceny, or more accurately that plaintiff had admitted or confessed to the crime of larceny of the "hold" cattle. Consequently, it is our opinion that under the facts of this case, there would not be any qualified privilege in the defendant at the time and place and under the circumstances they were alleged to have been uttered. This is not to be interpreted that there may not under certain conditions be a privilege for an otherwise slanderous statement to be made to the brand committee meeting. To illustrate the point we make more clearly, it would be a different situation if Waln had been one of the claimants of the proceeds of the "hold" cattle, and the committee was then confronted with the question whether Waln was entitled to such proceeds as opposed to Ethel Halligan and Sons. The defendant's

alleged slanderous statement would be pertinent, relevant and helpful to the committee in making its decision. These cattle did not belong to Waln nor did he claim them or the proceeds, but to Ethel Halligan and Sons and apparently they were never the property of Putnam, or at least that was the finding of the brand committee, even though Putnam's brand was on them. However, the burden is still on the plaintiff to prove the utterance by the defendant of the alleged slanderous words. We have reviewed the evidence at length. The transcript of the trial proceedings consists of nearly 600 pages and it is our opinion that the plaintiff has failed in his proofs of the alleged slanderous words. We have made such review fully aware that in determining whether or not there is any substantial evidence supporting the verdict, plaintiff is entitled to have the evidence reviewed in a light most favorable to him and to have all conflicts resolved in favor of the verdict. Barnhart v. Ahlers, 79 S.D. 186, 110 N.W.2d 125. In 53 C.J.S. Libel and Slander § 194, it is stated:

"Plaintiff must recover, if at all, for the publication of the particular matter referred to in the complaint or petition. Other actionable words not pleaded, although published at the same time, cannot be made the basis of recovery. It is essential that plaintiff prove, substantially as charged, the words laid in the declaration, petition, or complaint or a sufficient number of them to charge the particular offense alleged to have been imputed; and there is a fatal variance where the words proved are not the identical words alleged or words synonymous therewith or equivalent thereto."

In the case of Fleet v. Tichenor, 156 Cal. 343, 104 P. 458, the plaintiff brought an action against the defendant in which she charged in her complaint that the defendant spoke of her the following words: "Mrs. Fleet entered my house and stole some of my jewelry, and still has it". The California Court held,

"It is now, and long has been, the generally accepted rule that, where the defendant is charged with the speaking of certain specified slanderous words, it is sufficient to prove the substance of the precise words alleged, but

by this is meant, according to the overwhelming weight of authority, not that it is sufficient to show the speaking of other words which would produce an impression similar to that which the words alleged would produce, but, as was said by Justice Taggart in the opinion rendered by the district court of appeal in this case: 'Substantial proof of the words only is required as distinguished from a literal proof of the words alleged in the complaint, as was the original rule. The rule is not that the substance of the words alleged must be proved, but that the words alleged in the declaration, or enough of them to amount to a charge of the particular offense alleged to have been imputed, must be substantially proved.' In other words, so many of the words alleged in the declaration 'as constitute the sting of the charge' (Smith v. Hollister, 32 Vt. 695, 708), or so many of such words alleged as contain 'the poison to the character and constitute the precise charge of slander averred' (Lewis v. McDaniel, 82 Mo. 577), must be substantially proved."

■ The gravamen of the plaintiff's complaint is the word "stole". We do not believe the plaintiff has proven by a preponderance of the evidence that the defendant used this word, or a word of similar import. To sustain his burden of proof in this regard the plaintiff introduced two witnesses, Cleveland Bechtold and Ernie Bailey. Cleveland Bechtold had attended the meeting. He testified to the word "stole" having been used, but he also testified, on direct examination, as follows:

"Q. The conversation at that meeting swung over to these Halligan cattle?

A. Yes. Eventually.

Q. And at that time did Mr. Putnam make a statement to the group?

A. Yes, he did.

Q. And do you recall what he told the group, to the best of your knowledge?

A. To the best of my knowledge to the effect that John Waln had admitted that he — I don't know as he said 'stole' but I know he said he admitted that he had sold these cattle to him or so called got them some way or other and he offered to pay him back for the cattle.

Q. Did he use the words that he had admitted taking or stealing the cattle?

A. As I recall."

And again:

"Q. (Mr. Johnson continuing) Did he use — did John Waln — or, Mr. Putnam use the words 'John Waln admitted either taking or stealing the cattle'?

A. Well, he inferred that he had admitted that he willingly sold them to him and as I recall he said he admitted he had stolen the cattle and would pay him back for them. I am not positive on that. I know he said he sold him the cattle and he would pay him back for the cattle and he had admitted that he had done this before the people."

Mr. Bechtold was plaintiff's principal witness. He is the one who had brought back from the meeting the information to Mr. Waln. This is hardly satisfactory evidence on which to find a slanderous statement to have been made as alleged in the complaint. On cross-examination Mr. Bechtold testified as follows:

"Q. In other words you didn't hear Mr. Putnam use the word 'stole', did you?

A. To my best recollection I did but I would be — the way I remember it he said John Waln admitted selling these cattle and he told me that he would pay me back, or, pay me for these cattle but this is hard to say whether I am exactly right or not but this is the way I recall it, to that effect.

Q. But you don't recall this is the exact words that I have read out of Mr. Rick Johnson's Complaint?

A. This is to that effect but it's — I wouldn't say that is the exact words."

The only other witness plaintiff had to establish the slander as alleged in the complaint was Ernie Bailey who is an investigator for the Nebraska Brand Committee. He was in attendance at the Stock Growers meeting at Sioux Falls, accompanying Mr. Bechtold. On direct examination, he testified in part as follows:

"Q. And now, from my conversations with you prior to your testimony your remembrance of the exact words that were said are somewhat vague, am I right on that?

A. Just the wording on it, yes.

Q. Do you recall it substantially? Do you recall it the way Mr. Bechtold does?

A. Yes, substantially. Yes."

On cross-examination he testified in part:

"Q. Now, I want to get the exact other statement as you recall.

A. You are talking about the June 5th statement?

Q. What did Mr. Putnam say?

A. The June 5th statement?

Q. Right. This is the law suit here this June 5th, 1969 statement. Now, you go ahead and tell me what else Mr. Putnam stated.

A. Well, other than what I just told you — you mean — would you repeat that again? ( (Whereupon the

previous question was read to the witness, to wit: 'This is the law suit here this June 5th, 1969 statement. Now, you go ahead and tell me what else Mr. Putnam stated.'))

A. Like I say, they were settling up the stray cases on the two Halligan steers when Mr. Putnam made a statement as to these steers or strays — I mean, why he told the group there and primarily the Chairman I assume, that these — he got these cattle with a group of cattle that he bought from John Waln.

Q. Hold it.
All right.

A. And that John Waln had admitted selling him these cattle in the group of calves that he bought from Mr. Waln.

Q. All right.

A. And that — had offered to pay him back for them.

Q. O. K.

A. Then I am not sure if it was right at this time or whether it was a little later conversation but while this same case was being discussed he told of the fact that Waln had said that he, Halligan, owed him that for taking care of the cattle, pasturing and stuff, his cattle pushed in on him and that Waln figured he had it coming.

Q. And Mr. Putnam also said that Halligan owed John Waln?

A. This is what he said John Waln said.

Q. I am going to ask you this question. Did you hear these words exactly as I give them come from the

lips of Mr. Putnam at Sioux Falls, South Dakota on June 5th, 1969? 'John Waln told me that he stole those Halligan cattle and sold them to me' did you hear Mr. Putnam state those exact words at the meeting?

A. I wouldn't dare to swear to that that he did. There was a lot of noise and everything in this room but I do know that he sold them to him. I heard that but as to whether he said 'stole them' or not I couldn't say that he did."

53 C.J.S. Libel and Slander § 70 a. (2) states:

"Words charging a taking of property do not of themselves convey an imputation of larceny, since the property might reasonably have been taken under a claim of right, or through mistake, or in sport; but if it appears from the connection in which the charge was made or the circumstances attending its utterance that it was intended and understood to impute the crime of larceny it will be regarded as actionable per se."

And it has also been held that there is no material variance between the words alleged "did you get the $117" and the words proved — "Did you pick up that money." American Stores Company v. Byrd, 229 Md. 5, 181 A.2d 333. We do not believe that the testimony of the two witnesses in behalf of the plaintiff is sufficient proof of the publication of the slander as charged in plaintiff's complaint. The defendant as a part of his case called Mark Trask, chairman of the brand committee, Frank Wilson, a member of the South Dakota Stock Growers Association, Grant Otis, a member of the Stock Growers Association, Tom Houck, a member of the Stock Growers Association, Claire Coomes, a member of the brand committee, and Jim Holloway, chief brand inspector, all of whom were in attendance at the meeting in Sioux Falls on June 5, 1969, all of whom testified in effect that they heard Mr. Putnam speak at the meeting, but they did not hear him use the word "steal" or call the plaintiff a thief nor hear the defendant make a statement concerning the plaintiff as charged in the com-

plaint. Some of these men testified that as near as they could remember, Mr. Putnam stated that he had gotten these cattle from John Waln and one of these witnesses stated that he was sitting but two seats away from defendant Putnam at the meeting.

We have called attention in this opinion to the fact that there were at least 40 livestock growers in attendance. Their names and addresses are set forth in two exhibits. Aside from about four of the members present from outside the state, all of the names set forth in the exhibit have their residences in South Dakota. A part of them, other than those actually testifying, must have been available as witnesses to testify as to the statement made. At least their nonavailability appears nowhere in the record.

Since the evidence most favorable to the plaintiff does not support the verdict, we hold that the court erred in denying defendant's motion for a new trial. The judgment appealed from is reversed with directions that the defendant's motion for a new trial be granted.

HANSON, P. J., concurs in result.

BIEGELMEIER, J., concurs specially.

WOLLMAN, J., dissents.

DOYLE, J., not having been a member of the court at the time of argument, took no part in this decision.

BIEGELMEIER, Judge (concurring specially).

I concur in the opinion insofar as it holds the evidence is insufficient to sustain the jury verdict and the judgment must be reversed. While the proceedings appear to have been informal as they sometimes are before administrative boards, the Board had an issue before it, and statements were made, including the much differing ones set out in Judge Winans' opinion. If not directed to ownership of the animals, they may have been pertinent to a possible claim of an agister's lien. Defendant did not follow up his motions for a directed verdict so as to preserve claims therein

presented on appeal; had that been done, I believe the statement alleged in the complaint was a privileged communication within SDCL 20-11-5 as it was "one made * * * (2) * * * in any other official proceeding authorized by law". See opinion and reasoning of dissenting judges in Emo v. Milbank Mutual Insurance Company, 1971, N.D., 183 N.W.2d 508, 517.

WOLLMAN, Judge (dissenting).

There was testimony from plaintiff's witness Bechtold, elicited principally during cross-examination, from which the jury could find that defendant had made the statement charged in plaintiff's complaint. Drawing all legitimate inferences in favor of the verdict in the light of the record made in the trial court, I would hold that the evidence is sufficient to sustain the verdict.