**William JANKLOW,**

v.

**The VIKING PRESS, Peter Matthiessen Dakota News, Inc., d/b/a Cover To Cover; Janet Halligan; Donna Dyer, d/b/a Golden Mountain Books; and Bonnie Retterath,**

**No. 14657.**

Supreme Court of South Dakota.

Argued Jan. 9, 1985.

Decided Dec. 11, 1985.

Rehearing Denied Jan. 15, 1986.

Brent A. Wilbur of May, Adam, Gerdes & Thompson, Pierre, Joseph Butler of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, Charles Rick Johnson of Johnson, Eklund & Davis, Gregory, for plaintiff and appellant.

Martin Garbus of Frankfurt, Garbus, Klein & Selz, P.C., New York City, Gerald L. Reade of Brady, Kabeiseman, Reade, Abbott & Johnson, Yankton, for defendant and appellee The Viking Press.

Franklin J. Wallahan, Rapid City, for defendant and appellee Peter Matthiessen.

Carleton R. Hoy of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendants and appellees Dakota News, Inc.

d/b/a Cover to Cover, Janet Halligan and Bonnie Retterath.

Gene R. Bushnell of Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, Robert G. Mines, Hot Springs, for defendant and appellee Donna Dyer d/b/a Golden Mountain Books.

MORGAN, Justice.

In May of 1983, William J. Janklow, the present governor and former attorney general of South Dakota (Janklow), filed a complaint alleging that Peter Matthiessen (author) and Viking Penquin, Inc. (Viking), as author and publisher respectively, collaborated with the American Indian Movement (AIM), to publish and distribute a book *"In the Spirit of Crazy Horse,"* containing numerous "false and unprivileged statements" about Janklow.[1] The complaint further alleged that the statements were made "with actual malice or reckless disregard for the truth" and that all the libelous statements made against Janklow were "false and untrue" and that the author and Viking "had to entertain serious doubts about the truth of the libelous statements." Janklow claimed that the author and Viking, in failing to examine evidence that was available to them and in failing to disclose the evidence in the book, recklessly disregarded the truth or acted maliciously toward him. Janklow also contended that the reckless disregard for the truth is evidenced by their failure to interview him regarding the veracity of the charges repeated in the book. According to Janklow's complaint, all references to him were edited "in order to present a false and defamatory picture of him."

Janklow's complaint also named a number of bookstore owners and operators, all residents of South Dakota, as defendants and alleged that they "willfully refused to remove the book from the shelves ..." even though he had notified them of its libelous nature. Janklow contends that the "writing, publication, dissemination, sale, distribution and promotion of the book con-

---

1. There are, in total, twenty-nine references to Janklow.

stitutes a single libelous wrong" which holds him up to "public obloquy, ridicule and contempt" and has caused him extreme mental anguish, diminished his standing as a father and husband, and impaired his ability to seek and maintain public office or any other occupation. Janklow claimed actual damages of $4,000,000 and exemplary damages of $20,000,000 and requested a jury trial.

The defendants joined to remove the case to federal district court. After a hearing on Janklow's motion for remand, the case was remanded to a South Dakota Circuit Court on grounds that the validity of the claim against the book sellers presented an issue of state law. Defendants filed motions to dismiss on a number of grounds, including that the complaint failed to state a claim upon which relief could be granted. SDCL 15–6–12(b)(5). By agreement of the parties, any documents that might transform the motion for dismissal into a motion for summary judgment were withdrawn and the trial court purposefully disregarded all extraneous materials, documents, affidavits and other papers submitted by the parties, except those that would properly be considered in a SDCL 15–6–12(b)(5) motion.

Defendants' motions for dismissal were granted by the trial court and an order was entered dismissing the complaint with prejudice and on the merits against all defendants. The trial court's memorandum decision was incorporated in its order of dismissal.

Janklow appeals from the trial court's order dismissing his complaint and sets out three issues: (I) This court should not adopt the neutral reportage doctrine in defamation cases; (II) the publication in question here does not qualify for immunity under the neutral reportage standard; and (III) Article VI, § 5 of the South Dakota Constitution requires that this matter be

submitted to a jury for its determination. In our examination of the briefs and after oral argument by the parties, we resolve the appellant's issues into the following: (1) Did the trial court err in granting the defendants' motions under SDCL 15–6–12(b)(5); and (2) is the neutral reportage doctrine applicable in defamation cases in South Dakota?

We will examine the decision in two segments, the first with respect to the author and Viking; the second with respect to the bookstore owners and operators.

We first examine the issue on granting the SDCL 15–6–12(b)(5) motion. A motion under SDCL 15–6–12(b)(5) is identical to a motion under FRPC 12(b)(6). For convenience hereafter, defendants' motions will be referred to as Rule 12(b)(5) motions. We hold that the trial judge did err in granting it.

In its decision, the trial court correctly noted that, for the purposes of the motion, the complaint is construed in the light most favorable to the pleading party, facts "well pled" and not mere conclusions may be accepted as true and doubts are resolved in favor of the pleader. It also noted, "pleadings should not be dismissed merely because the court entertains doubts as to whether the pleader will prevail in the action as this is a matter of proof, not pleadings. The rules of procedure favor the resolution of cases upon the merits by trial or summary judgment rather than on failed or inartful accusations." *Citing* 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1357 (1971). The trial court then points out the exception noted in *Wright & Miller* for traditionally disfavored causes of action such as libel.[2]

The trial court then proceeded to examine the pleadings and the text of *"In the Spirit of Crazy Horse"* apparently as a matter validly incorporated in the com-

---

**2.** "There is one significant exception to the general rule that the complaint will be construed liberally on a Rule 12(b)[ (5) ] [SDCL 15–6–12(b)(5) ] motion. When the claim alleged is a traditionally disfavored 'cause of action,' such as malicious prosecution, *libel,* slander, the courts tend to construe the complaint by a somewhat stricter standard and are more inclined to grant a Rule 12(b)[ (5) ] motion to dismiss[.]" 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1357 (1971) at p. 610. (Emphasis in original.)

plaint by reference.[3] The trial court determined that under the limitations or "constitutional privilege" set out in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Edwards v. National Audubon Society*, 556 F.2d 113 (2d Cir.1977), Janklow failed to show that the defendants exceeded the constitutional privilege or that their actions were outside the *Sullivan* limitation.

This court has previously approved the trial court's grant of a Rule 12(b)(5) motion in libel cases. In *Brech v. Seacat*, 84 S.D. 264, 170 N.W.2d 348 (1969), we found an absolute privilege in a communication made by a sentencing judge to the Board of Pardons and Parole under the statutory duty of a trial judge concerning clemency. Again, in *Janklow v. Keller*, 90 S.D. 322, 241 N.W.2d 364 (1976), we likewise found an absolute privilege in a communication made in a judicial proceeding to remove a case to federal court. In *Hackworth v. Larson*, 83 S.D. 674, 165 N.W.2d 705 (1969), we affirmed a summary judgment granted defendant Secretary of State for a news release which we found to be absolutely privileged in the proper discharge of the official duties of a constitutional officer. In *Ruple v. Weinaug*, 328 N.W.2d 857 (S.D.1983), we also approved the summary judgment granted defendant, city manager, for a communication to the mayor which we held to be absolutely privileged in the discharge of his official duties. There is no indication that a Rule 12(b)(5) motion was ever presented to the trial court in *Hackworth, supra,* or *Ruple, supra,* but it does appear that our holdings approving Rule 12(b)(5) motions have been restricted to libel cases where the defendants enjoy an absolute privilege. The citation of *Hackworth* and *Ruple* are not made to suggest that the same is true as regards summary judgment motions. In *Uken v. Sloat*, 296 N.W.2d 540 (S.D.1980), we approved the grant of summary judgment under a qualified privilege, SDCL 20–11–5(3) communication between interested individuals. An ab-

solutely privileged communication is one for which, by reason of the occasion on which it is made, no remedy is provided for the damages in a civil action or slander or libel. 53 C.J.S. Libel and Slander § 88 (1948). "The difference between a qualified and an absolute privilege is that malice destroys the qualified privilege but does not affect the latter." *Waln v. Putnam*, 86 S.D. 385, 394, 196 N.W.2d 579, 583–4 (1972).

As will more fully appear in the development of the second issue, the First Amendment protection afforded the press is a qualified privilege, in that it falls before proof of malice. Even in *Edwards, supra,* upon which the defendants rely, the court said: "[A] publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage." 556 F.2d at 120. In *Sullivan,* the Supreme Court said: "The [First Amendment] guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

Finally, SDCL 20–11–5 reads, in pertinent part:

A privileged communication is one made:

. . . .

(4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding or of anything said in the course thereof.

In the cases provided for in subdivision ... (4) of this section, malice is not inferred from the communication or publication.

---

**3.** No one raises any objection to the trial court having considered the text of the book in arriving at its decision.

■ We therefore hold that the trial court erred in granting defendant author's and publisher's Rule 12(b)(5) motions. We reverse and remand that portion of the case for further proceedings.

Since this case on remand will still be in the pretrial stage and the defendants, author and publisher, will undoubtedly be making motions for summary judgment or directed verdicts, we deem it necessary to render a decision on the second issue, the applicability of the doctrine of neutral reporting in South Dakota. The issue has been amply briefed and argued.

■ The common law privilege of fair report protects the publishers of false and defamatory matter in an account of a public official proceedings of a court, legislature, administrative body when the report is a fair and accurate account of the proceedings, the report is made in good faith and without malice (in the sense that it was made without intent to harm or with reckless disregard for the rights of another), and the report purports to be an account of official activity. *See* K. Sowle, Defamation and the First Amendment: the Case for a Constitutional Privilege of Fair Report. 54 NYU L.REV. 471–4. In South Dakota the common law privilege has been codified as SDCL 20–11–5(4).

In *Hackworth, supra,* we said: "Whether defamatory statements made concerning public officials are actionable is now a matter of Federal Constitutional Law." 83 S.D. at 683, 165 N.W.2d at 709. In *Wollman v. Graff,* 287 N.W.2d 104 (S.D.1980), we noted the case of *Sullivan, supra,* to be the genesis for a federal rule limiting the right of a public official to recover damages for defamatory falsehoods relating to his official conduct, quoting the *Sullivan* rule as set out under the first issue. The concept of public officials, as found in *Sullivan,* was broadened to public figures in the companion cases of *Curtis Publishing Co. v. Butts,* and *Associated Press v. Walker,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

In *Wollman, supra,* we also reviewed some of the cases defining malice, pointing out among other things

[that] malice cannot be presumed; ... that malice is more than negligence and is probably even more than highly unreasonable conduct; ... [that] the reckless-disregard-of-truth standard requires far more than proof of the absence of a reasonable belief in the truth of the statement; ... that plaintiff must show the false publication was made with a high degree of awareness of ... probable falsity; ... [and finally, that] malice cannot be proved merely by the existence of ill will or intent to cause harm.

287 N.W.2d at 106.

In 1971 the United States Supreme Court handed down the decision, *Time, Inc. v. Pape,* 401 U.S. 279, 291, 91 S.Ct. 633, 640, 28 L.Ed.2d 45, 54 (1971), stating: "The publisher who maintains a standard of care such as to avoid knowing falsehood or reckless disregard of the truth is thereby given assurance that those errors that nonetheless occur will not lay him open to an indeterminable financial liability." Further, if " 'the freedoms of expression are to have the "breathing space" that they need to survive,' misstatements of this kind must have the protection of the First and Fourteenth Amendments.' " 401 U.S. at 292, 91 S.Ct. at 640, 28 L.Ed.2d at 54 *quoting New York Times, supra,* 376 U.S. at 271–72, 84 S.Ct. at 724, 11 L.Ed.2d at 701. Finally, the Court stated, citing *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), on which we relied in *Wollman,* " '[n]either lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.' " 401 U.S. at 292, 91 S.Ct. at 640–41, 28 L.Ed.2d at 55.

Some six years later the Second Circuit Court of Appeals in *Edwards v. Audubon Society,* 556 F.2d 113 (2nd Cir.1977), relied

heavily on *Pape, supra*, to enunciate what Chief Judge Kaufman, author of the opinion, referred to as "the press' right of neutral reportage." In essence, the opinion stated that "when a responsible prominant organization ... makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity." 556 F.2d at 120.

We find very interesting a critique of the *Edwards* opinion, by the Second Circuit Court of Appeals, in the later case of *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2nd Cir.1980). The decision first centered on the issue whether the alleged defamatory material as reported was absolutely protected as opinion as the lower court had found or whether it was reported as factual and susceptible of defamatory connotation. Finding the latter, the opinion then considered the material in the light of *Edwards* and found that the material fulfilled almost none of the conditions laid down in *Edwards*. In commenting on *Edwards*, the decision noticed that while the *Edwards* opinion did not attempt precise definitions of its contours, it did contain important suggestions that the privilege was limited in scope and required careful examination of the facts in each case. Among the examples listed, we find: "What is newsworthy about these accusations is that they were made"; that "the public interest in being fully informed about such controversies that rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them"; and "while we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made ... [i]t is equally clear, however, that a publisher who in fact espouses or concurs in the charges made by others or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage but, rather,

assumes responsibility for the underlying accusations." *Id.* at 68.

We particularly note the cautionary statement:

> The need for the careful limitation of a constitutional privilege for fair reportage is demonstrated by the breath of that defense, which confers immunity even for publishing statements believed to be untrue. Absent the qualifications set forth by Chief Judge Kaufman in *Edwards*, all elements of the media would have absolute immunity to espouse and concur in the most unwarranted attacks, at least upon any public official or figure, based on episodes long in the past and made by persons known to be of scant reliability. And this, although without any such immunity, the media already enjoy the generous protection afforded by New York Times Co. v. Sullivan with respect to erroneous statements of fact or opinion.

639 F.2d at 69–70.

To date, the United States Supreme Court has not adopted the neutral reportage privilege, nor have we found any cases where our Eighth Circuit has adopted it.

It is of particular interest to note that in the recent decisions from that Court in *Janklow v. Newsweek, Inc.*, 759 F.2d 644 (8th Cir.1985) (rehearing en banc September 10, 1985), wherein the Eighth Circuit Court of Appeals reviewed a grant of summary judgment for Newsweek, the privilege of neutral reportage was never considered. On the issue of the District Court's finding that Newsweek's report was basically true, the panel affirmed the lower court on the question of minor errors as not being defamatory with regard to *material* facts, and on the question of omissions of facts, the decision was grounded on *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1971), for the proposition that a newspaper is held liable for what it *does* print, not for what it does not. Finally, on the question whether the article could be read to imply that Janklow was

actually guilty of rape, the panel held that publication of a materially true statement is constitutionally protected. *Janklow,* 759 F.2d at 649, *citing Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

The summary judgment was reversed, however, on the issue of whether the article accused Janklow of prosecuting Banks for a motive of revenge. The article stated that prosecution was begun after Banks brought the rape charges against Janklow, when, in fact, Janklow had commenced prosecution of Banks and other rioters involved in the Custer County Courthouse incident prior to the bringing of the rape charges. On this issue, *Cianci, supra,* was relied upon on the question of protection of opinions as opposed to a factual account. No reference was made to *Cianci* regarding neutral reportage.

■ We agree with the observation of Judge Friendly in *Cianci,* that the media already enjoys the generous protection accorded by *New York Times Co. v. Sullivan* with respect to erroneous statements of fact and opinion. We therefore decline to adopt the privilege of neutral reportage in South Dakota relying instead on the protections afforded by *Sullivan* and subsequent cases decided by the United States Supreme Court and the Eighth Circuit Court of Appeals.

We next examine the disposition of the Rule 12(b)(5) motions concerning the book sellers. In its memorandum decision, the trial court, having determined that the book is not defamatory, stated: "It logically follows that ... the book distributors and the book sellers may not be sued for defamation." The trial court acknowledged that motions for summary judgment had been filed by the book sellers and distributors but opined that "this stage need not be reached in this case."

■ In view of our dispositions of the dismissal as to the author and publisher, above, it logically follows that the dismissal as to the book sellers must fall also. On remand, the summary judgment stage may be reached.

Because the trial court will undoubtedly consider the motion for summary judgment upon remand, we again set out our view on the pertinent law for guidance.

Restatement (Second) of Torts § 581 (1977) sets out the applicable law, which in pertinent part is: "One who only delivers or transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character." As the comments thereunder note, "the [news] dealer is under no duty to examine the various publications that he offers for sale to ascertain whether they contain defamatory items. Unless there are special circumstances that should warn a dealer that a certain publication is defamatory, he is under no duty to ascertain its innocent or defamatory character."

In *Lewis v. Times Inc.,* 83 F.R.D. 455, 463 (E.D.Cal.1979), the district judge noted the similarity between the Restatement (Second) of Torts' formulation and California decisions. The decision states: "The general rule for defamation is that everyone who takes a responsible part in publication is liable for the defamation." A California Court of Appeals so held in *McGuire, M.D. v. Brightman,* 79 Cal. App.3d 776, 145 Cal.Rptr. 256 (1978), when a plaintiff sought successfully to enforce a South Dakota libel judgment against a reporter for a story based on information gathered in South Dakota and published in a California paper distributed in part in South Dakota. In *Lewis,* the court pointed out that there can be no liability without scienter. We agree with these observations. Scienter, in the connotation commonly used, signifies that the alleged tort "was done designedly, understandingly, knowingly, or with guilty knowledge." *People v. Gould,* 237 Mich. 156, 164, 211 N.W. 346, 348–49 (1926).

■ It is our further opinion that the knowledge or scienter must be viewed against a First Amendment backdrop. Of a certainty, any privilege afforded to the

author of the defamatory article or book would be afforded to a mere book seller. It would be ridiculous to say that the author of a libel could escape any liability because malice could not be demonstrated, but that nevertheless, a book seller, or a public library for that matter, could be held liable simply on the basis of knowledge that the publication contains some defamatory material. A book seller is entitled to the same protection afforded by *Sullivan, supra,* that prohibits a public official from recovering damages for defamatory falsehoods unless he proves that the statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

We therefore reverse the trial court's decision regarding the book sellers and remand for further proceedings in accordance with this decision.

FOSHEIM, C.J., HERTZ, Acting Justice, and HECK, Circuit Judge, concur.

HENDERSON, J., concurs specially.

HECK, Circuit Judge, sitting for WUEST, Circuit Judge, acting as a Supreme Court Justice, disqualified.

HENDERSON, Justice (specially concurring).

This appeal is not a case deciding whether Janklow is right or wrong or the publisher, author, or book sellers are right or wrong; or whether Janklow was or was not libeled; it is only to decide, in law, if his complaint states a cause of action for libel. In different vernacular, the question is: Did Janklow's attorneys fail to plead what we lawyers term a cause of action for libel?

Reviewing the ten-page complaint of the pleader, it appears to me that a cause of action for libel is pleaded. Therefore, I join the reversal.

This case has not even reached the summary judgment stage. Discovery has not progressed to any great extent, although there has been some discovery. Considering that the prayer for damages is $4,000,000 in compensatory damages plus five times the amount of these damages in punitive damages, a paucity of facts have been developed. Thus, the copious argument of facts advanced by all of the parties is based more on stratagem than a basic mooring of proof. "A motion to dismiss ... tests the law of a plaintiff's claim and not the facts which support it." *Hunt v. Hunt,* 309 N.W.2d 818, 820 (S.D.1981).