**Donald Ray ANSELMI,
Plaintiff-Appellant,**

**v.**

**The DENVER POST, INC., a Colorado
Corporation, et al.,
Defendants-Appellees.**

**Raymond B. WHITAKER,
Plaintiff-Appellant,**

**v.**

**The DENVER POST, INC., a Colorado
Corporation, et al.,
Defendants-Appellees.**

Nos. 75–1998, 75–1999, 76–1099.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 24, 1977.

Decided March 7, 1977.

Rehearing Denied March 29, 1977.

Certiorari Denied June 20, 1977.
See 97 S.Ct. 2960.

Edward P. Moriarity, Casper, Wyo. (G. L. Spence, Casper, Wyo., on the brief), for plaintiff-appellant Anselmi.

F. M. Andrews, Jr., Riverton, Wyo., for plaintiff-appellant Whitaker.

Robert S. Warren of Gibson, Dunn & Crutcher, Los Angeles, Cal. (Paul B. Godfrey of Godfrey & Sundahl, Cheyenne, Wyo., and Richard P. Levy of Gibson, Dunn & Crutcher, Los Angeles, Cal., on the brief), for defendant-appellee The Times Mirror Co.

Before SETH, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

In this appeal from a dismissal of a defamation action, the issues presented to us are threshold ones: (1) whether the Wyoming Long-Arm Statute applies, and (2) the presence or absence of sufficient contacts in Wyoming of The Times Mirror Corporation, a California corporation, to constitute a basis for the exercise of personal jurisdiction over it by the United Stated District Court for the District of Wyoming. The trial court, Judge Kerr, dismissed the action against The Times Mirror Corporation for want of personal jurisdiction. 401 F.Supp. 60. We reverse.

The article which is here claimed to be defamatory appeared in The Los Angeles Times newspaper on July 5, 1974. It concerned alleged criminal activities in Wyoming and especially in the City of Rock Springs. It was entitled "U. S. Tries to Close Up 'Wide Open' Wyoming." The plaintiffs Donald Ray Anselmi and Raymond B. Whitaker were expressly named in the article which said that they had testified before a grand jury in Los Angeles and were asked if they had bought guns in Wyoming which they knew had been stolen in California. The Times article commented that even if the gun running was provable, the incidents hardly appeared to be high crimes. However, it added that members of the Federal Crime Strike Force are attempting to determine " * * * if * * * [these] politicians are involved in more serious matters." The alleged libelous article discussed many types of organized crime in Rock Springs including murders for hire, jewel and fur thievery and other high crimes. Plaintiffs allege that the innuendos in the article imply that they were heavily involved in these high crimes. The further allegations are that the article was untrue and was printed with malicious intent, or in the alternative, with a reckless disregard for its truth.

Further allegations are to the effect that contemporaneously with the publication of the July 5, 1974 story in the Los Angeles Times, defendant through the Los Angeles Times news service, a wholly-owned business, caused a story to be released for publication by subscriber newspapers throughout the United States. The defendant vehemently denies this statement and in its brief argues that it has no news service subscribers in Wyoming and that any publication of the articles there took place in violation of the copyright of the Los Angeles Times and without its permission.

The Times Mirror is, as we have noted, a California corporation having its principal place of business in California. It publishes the Los Angeles Times which is first distributed there. It does not, of course, have any offices, listings, employees or assets in Wyoming, but some syndicated features are sold to newspapers subscribers in Wyoming.

This amounts to about $2000. Also, a Times Mirror representative visits the state twice a year. Also, some direct mail solicitations are sent to Wyoming newspapers and there are mail solicitations of advertising sent into Wyoming and other states.

The plaintiff, Anselmi, lives in Rock Springs, Wyoming, and is engaged in business there. The plaintiff, Whitaker, is an attorney who resides in and practices law in Casper. He also has some business in Rock Springs.

The Los Angeles Times had, previous to the publication in question, sent three reporters to investigate and to gather news in Rock Springs and other Wyoming towns. Two of them spent three days each and the other spent approximately ten days in Wyoming. All of this activity was to gather news for the story in controversy. The one who was there more than a week spent about $1,000. The other two spent $665. The story giving rise to the lawsuit carried a Rock Springs, Wyoming dateline.

The complaints of both Anselmi and Whitaker allege that the Los Angeles Times exchanged information with The Denver Post and vice versa. The Los Angeles Times and The Denver Post are alleged to have worked together in the development of the Rock Springs crime story which is the basis of this lawsuit. The first story was published in The Denver Post on June 23, 1974, and thereafter it was made available to the news services to which the Post subscribed, including United Press International (UPI) and the Associated Press and was circulated through those wire services in Wyoming and, of course, throughout the country.

During this time of initial publication, the Times Mirror through the Los Angeles Times continued the development of its own story and thereafter published an expanded and more detailed version of it on July 5, 1974. It is alleged that this story was made available for further distribution and republication through the Times to its news services, the UPI and the Associated Press. These stories appeared in a number of Wyoming newspapers and in other newspapers across the nation. Further allegations tell about additional publications following the release of the Los Angeles Times story.

The district court's dismissal which was entered on the second day of October relied on *Insull v. New York World-Telegram Corporation*, 273 F.2d 166 (7th Cir. 1959), *cert. denied*, 362 U.S. 942, 80 S.Ct. 807, 4 L.Ed.2d 770 (1960), for its holding that because the single publication rule applied, the tortious act occurred not in Illinois where there was distribution of the paper and where the complaint was filed, but in New York where the paper was first published. Judge Kerr applied the reasoning of the *Insull* case to the fact situation at bar saying that the Wyoming Long-Arm Statute did not apply as a basis for jurisdiction. Wyo.Stat. Section 5–4.2(a)(iii) and (iv). The trial court held that part (iii) was inapplicable because the act was complete in California and not in Wyoming and subsection (iv) was ruled out by reason of the lack of evidence of doing a volume of business in Wyoming.

The contentions of the plaintiffs are that the trial court erred in the following respects:

First, in its holding that it was without jurisdiction under Wyoming Statutes, Section 5–4.2(a)(iii).

Second, that the court erred in determining that jurisdiction could not be exercised over the Times Mirror Company since it did not carry on a regular course of business in Wyoming.

Third, that the court erred in refusing to defer a ruling on the defendant's motion to dismiss, which request was made by the plaintiff for the reason that jurisdictional discovery was then in progress and it was not completed. The court lacked sufficient facts to rule.

## I.

### WHETHER JURISDICTION EXISTS UNDER THE WYOMING LONG–ARM STATUTES, SECTIONS 5–4.2(A)(III) AND (IV)

The relevant provisions of the Wyoming Long-Arm Statute which were considered

by the court are subsections (iii) and (iv). They provide:

[Section] 5–4.2. *Same—Personal jurisdiction where otherwise not provided by law.*—(a) In addition to all other bases of jurisdiction otherwise authorized or provided by law, any court of this state may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's

\*   \*   \*   \*   \*   \*

(iii) causing tortious injury by an act or omission in this state;

(iv) causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct in this state or derives substantial revenue from goods consumed or services used in this state.

In reliance on *Insull, supra,*[1] Judge Kerr reasoned that the single publication rule applied in Wyoming and that the *Insull* case was germane; that the defamation under the rule was capable of having but a single publication and that occurred in California, not in Wyoming; that by reason of California's exclusive jurisdiction Wyoming was precluded from entertaining the case. Thus subsection (iii), *supra,* which calls for a tort being committed in Wyoming was by its terms inapplicable since the final act occurred in California.

As to subsection (iv), which calls for regular soliciting of business or engaging in a persistent course of conduct or deriving substantial revenue from goods consumed or services rendered, it was ruled out for lack of the necessary volume of business in Wyoming.

■ We agree with the trial court's ruling as to the non-applicability of subsection (iv), for this is not a "doing business" set of facts. We must, however, disagree with the trial court's holding that subsection (iii) does not apply because of the single publication rule. In our view that section, which simply demands causing tortious injury in Wyoming, governs. Where, as here, it is alleged that a defamatory statement has been sent into Wyoming and causes injury to a Wyoming resident, subsection (iii) is at least potentially applicable depending on the other facts. It is also our view that the single publication rule has nothing to do with the concept of personal jurisdiction such as is presented here. Efforts to link it exclusively to a particular forum court is a distortion. The rule is designed to prevent multiple suits and unending judgments growing out of the same act of defamation.

A Wyoming case furnishes a clear analogy in support of the position which we have taken, namely, that a tort is not only complete at the place where the allegedly libelous material was published, but rather can have effects where the plaintiffs who are

---

1. *Insull, supra,* at page 171, expressed the view that there could not be a tort committed by the New York World-Telegram in Illinois by sending the defamation into the state. It said:

Upon the same facts which we have found inadequate to prove defendants transacted any business within Illinois, plaintiff now asks us to hold that all of the defendants committed a tortious act there. None of the defendants either personally or through an agent was present in Illinois. Cf. *Nelson v. Miller,* 11 Ill.2d 378, 393, 143 N.E.2d 673, 681. The court rejected the proposition that there could be injuries and claims at the place where the plaintiff resides. On this it said:

Plaintiff argues that "each publication of the Lucey article is a separate tort and the subject of a separate cause of action" and also that "it is well settled that the place of wrong, or the place where the last event necessary to make the defendant liable in

tort occurs, is 'where the defamatory statement is communicated', and not the place 'from which the offending material is sent or where it originates.'" He adds that the "several torts were nonetheless committed when the newspapers were received in Illinois after having been mailed by the defendants."

In substance, plaintiff argues that the appearance of defendants' papers in Illinois is the "last event necessary to make the defendant liable in tort". That this is a mistaken conclusion is established by Illinois law. 273 F.2d at 171. The court further elucidated that in cases of multistate circulation the cause of action for libel is absolutely complete at the time of first publication and subsequent appearances or distributions are of no consequence but are only relevant in computing damages. The court concluded that there was no tort committed in Illinois and dismissed on that basis.

allegedly libeled reside. We refer to the decision of the Supreme Court of Wyoming in *State of Wyoming v. Levand*, 37 Wyo. 372, 262 P. 24 (1927). This was a criminal defamation action wherein the issue was in which county within Wyoming venue would lie where the libel was published in one county but was published and distributed in another county where the libelee resided. The ruling was that venue would lie in the county of plaintiff's residence and was not limited to the county where the libel was first printed. The Wyoming Court observed:

> . . . to hold that the place of printing and issuing the paper is the only place where such prosecution can take place might also lead to great abuse, and would, for instance, enable a newspaper, printed outside of the state but circulated within it, to vilify citizens of this state without restraint, leaving the latter virtually helpless victims in the hands of the unscrupulous, even though the authors of a libel should live in this state or could be reached within it subsequent to the publication. . . .

*Id.*, 262 P. at 28. And *cf. Spriggs v. Associated Press et al.*, 55 F.Supp. 385 (D.Wyo. 1944), which also recognizes multiple publications of defamatory material.

The *Levand* holding thus points the way to the view which the Wyoming Supreme Court would probably adopt. A more important result is its recognition that there can be injuries beyond the place where the libel first came to the surface through a publication of the newspaper. It recognizes that one can be libeled at the place where he resides and where his reputation resides. Since, however, the trial court went beyond holding that Wyoming would probably follow the single publication rule and ruled in addition that the single publication rule controls personal jurisdiction, we cannot stop here but must take up the question whether the single publication rule carries all of the consequences which have been attributed to it.

## II.

IS THE SINGLE EFFECTIVE PUBLICATION THAT WHICH TAKES PLACE WHERE A NEWSPAPER IS PRINTED AND CIRCULATED, AND IS THE COURT OF THE PLAINTIFF'S DOMICILE THUS PRECLUDED FROM EXERCISING JURISDICTION?

The Second Circuit in a definitive case, *Buckley v. New York Post Corporation*, 373 F.2d 175 (2d Cir. 1967), rejects the entire notion that the single publication rule precludes the exercise of jurisdiction by all of the courts except the court in the place where the paper is published and distributed. Buckley, a resident of Connecticut, had instituted a libel action in state court there against the New York Post, a Delaware corporation which had its principal place of business in New York City. The Post removed it to the United States District Court for the District of Connecticut. Buckley contended there that the Post was subject to personal jurisdiction under subsections (iii) and (iv) of the Connecticut Long-Arm Statute.

Subsection (iii), unlike the Wyoming subsection (iii), was plainly designed to cover products liability. Subsection (iv) of the Act was like the Wyoming subsection (iii) and was not so limited. It extended broadly to tortious injury committed within the state. It was contended there, as it is here, that the single publication rule would likely be adopted by the State of Connecticut and the Second Circuit did not disagree with this. The important thing is that the court ruled that this did not prevent a suit from being brought in Connecticut and did not deprive the Connecticut court of jurisdiction.

The court, speaking through Judge Friendly, pointed out that the single publication rule had nothing to do with the place of filing the lawsuit.[2] The Friendly opinion

---

**2.** Judge Friendly's opinion said:

> To hold that the single-publication rule exempts a publisher of a newspaper or magazine or a broadcaster from a long-arm statute that would otherwise have been applicable would be quite as artificial as the "last

properly noted that this misconception was based on the old "last event" rule enunciated in the first Conflicts Restatement and the old English case of *Duke of Brunswick v. Harmer, supra.* The Judge then went on to say that the single publication rule existed for the purpose of preventing multiplicity of suits and almost endless tolling of statute of limitations. The court said that these goals can be satisfied by holding that an injured plaintiff can collect his damages in one action, and so then held that there was no relationship to the exercise of personal jurisdiction over a claim arising at the place of the plaintiff's residence. The court went on to reject the doctrine on the ground that it was mechanical.[3] The rule in the *Insull* case, it was pointed out, protected only the defendant and did not recognize the plaintiff's rights.

The *Buckley* opinion calls attention to the illogic of reading a statute like subdivision (iv) of the Connecticut Act (causing a tort within the state) so as not to permit a suit in the state of the plaintiff's residence, especially where the plaintiff lives some distance from the place of location of the newspaper, requiring as it does, the plaintiffs to travel to a distant place and to enshrine as the only forum a state far removed from the evidence and where the witnesses are unfamiliar with the reputation which has allegedly been injured. Finally, it was said that the *Insull* decision was difficult to reconcile with the long-arm statute since the essence of the defamation is injury to the reputation of plaintiff in his home area where he is known.

The Restatement of Conflict of Laws (Second), Section 150, has corrected the mistake that was made following the "last event" doctrine. Section 150 declares that rights and liabilities from defamatory material are determined by the local law of the state which has the most significant relationship to the occurrence, and subsection (2) declares that a significant relationship exists in the state where the party was domiciled at the time that the matter complained of was published in that state.

Comment (e) of this section provides that when there has been a publication in two or more states of an aggregate publication

---

event" approach of the first Conflicts Restatement and the separate publication concept of *Duke of Brunswick v. Harmer,* 14 Q.B. 185, 117 Eng.Rep. 75 (1849), which the new rule was intended to overcome. Elliptical statements that a libel by newspaper is "complete" upon publication, though often accurate enough in their particular context, should not obscure that the purpose of the single publication rule is not to deprive a plaintiff defamed in another state of a privilege to sue there which the legislature had granted generally to persons injured by wrongful conduct within its borders, but rather to protect the defendant—and the courts—from a multiplicity of suits, an almost endless tolling of the statute of limitations, and diversity in applicable substantive law. See 1 Harper & James, Torts Section 5.16 (1956); Prosser, Torts 788–89 (1964). These goals can be sufficiently accomplished by holding that the plaintiff must collect all his damages in one action, that the statute of limitations begins to run on the initial publication, and that substantive issues will be governed by a single law—deciding just which is a harder nut to crack, see Restatement (Second) Conflict of Laws § 379e (Tent. Draft No. 9, 1964). 373 F.2d at 179–80.

**3.** The court added:

> To be sure, if only the interests of the defendant were to be considered, these objectives could be more certainly accomplished by minimizing the possibilities of suit at a place other than that of initial publication, since that forum presumably would apply its own statute of limitations and, *non constat* Restatement Second § 379e, might have a bias in favor of its own substantive law. *But defamed persons have rights too*; the interests of the defendant are not so dominant as to require a mechanical application of the single publication rule in such a manner that circulating a libel outside that state should be treated as if it never occurred. Moreover, as a matter of precedent, this court's holding, in *Mattox v. News Syndicate Co.,* 176 F.2d 897, 904, 12 A.L.R.2d 988 (2 Cir.), cert. denied, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525 (1949), that the single publication rule did not make the tort so "complete" at the place of publication as to preclude application of the substantive law of plaintiff's domicile, argues strongly against defendant's claim.
>
> 373 F.2d at 180 (emphasis added.)

claimed to be defamatory, at least most issues involving the tort should be determined by the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation and that this will usually be the state of the plaintiff's domicile.

These expressions are entirely in accord with the ruling of the Second Circuit in *Buckley.* They make it clear that the publication is not so complete at the place of first publication as to not allow an action elsewhere in a situation such as this where the plaintiff is unknown at the place of first publication and has a reputation only in his home state.

Prosser on Torts expresses the same viewpoint as does Harper and James, that a need existed at the time of their being written for a true single publication rule— one which prevents multiple lawsuits based on the same defamatory statement by the same plaintiff. Prosser, Law of Torts, Section 113 (4th ed. 1971); 1 Harper and James, Section 5.16 (1956). Recent cases which have adopted the modern view and rejected the *Insull* approach include one from Illinois which calls attention to the change in the Illinois law. This is the case of *Process Church of Final Judgment v. Sanders,* 338 F.Supp. 1396 (N.D.Ill.1972). The court, through Judge Hubert Will, had to determine whether the *Insull* decision continued to represent the law in Illinois. The determination was that it did not. In the course of its ruling the court noted that the *Insull* case was contrary to the decision of the Illinois Supreme Court in *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961), as to torts committed in the state as a result of a force originating elsewhere. *Gray,* it was noted, a landmark decision on torts committed within the state, overturned the *Insull* holding as to torts committed within the state.

In 1959, the Illinois Legislature passed the Uniform Single Publication Act which provided that no person could have more than one cause of action for damages for libel or slander or any other tort founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine, etc. It further said that any recovery in any action included all damages for any such tort suffered by the plaintiff in any jurisdiction.

The Act does not mention jurisdiction nor does it include any limitation on the forum selection. On this Judge Will said:

> The Uniform Act clearly was not intended as a limitation upon a state's jurisdiction including its long arm jurisdiction. Indeed, the purpose behind any single publication rule is to protect both the courts and the defendant publishers from a multiplicity of suits, disparity in applicable substantive law, and a seemingly endless tolling of the statute of limitations. *See,* Prosser, Torts 788–9 (1964); 1 Harper & James, Torts § 5.16 (1956). To read a limitation upon the exercise of a state's jurisdiction into the Uniform Act, as Dutton would, is totally unsupportable given the clear language of the Uniform Act and its stated purpose.

338 F.Supp. at 1400.

The Court's final observation was that the "demise" of the *Insull* decision avoided the anomalies that its continuing application would have engendered; that the blind application of it has run counter to accepted concepts of rational jurisprudence.

*Insull,* the court concluded, would have required dismissal of the case before the court and would have sent the plaintiff on a journey to New York in quest of a forum, taking all of his witnesses with him. The court added:

> Since libel is a damage to one's reputation and can be caused only in those jurisdictions where a reputation exists, *Insull* not only would necessitate travel and expense for an injured plaintiff but also would make proof of damages diffi-

cult, if not impossible, in a jurisdiction where the plaintiff was unknown.

338 F.Supp. at 1400.

### III.

## ARE THERE PRESENT THE MINIMUM CONTACTS WHICH THE CONSTITUTION REQUIRES IN ORDER TO SUBJECT THE ALLEGED TORT-FEASOR OR CONTRACTING PARTY TO AMENABILITY TO SUIT WITHIN THE STATE OF WYOMING?

We hold that the minimum contacts are present. In answering the above question we consider first the decision of the Supreme Court in *International Shoe Company v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). There the State of Washington was seeking to exact and collect taxes from the shoe company. These were unemployment compensation costs, a specified percentage of the wages paid by each employer for wages earned by employees in the state. In upholding the jurisdiction of the state to levy the taxes in question it was pointed out that the shoe company employed a number of salesmen within the state and that they were present systematically and continuously through a period of years and this resulted in a large volume of interstate business. The Supreme Court said:

> But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations *arise out of or are connected with* the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Supra*, at 319, 66 S.Ct. at 160 (emphasis added.)

If jurisdiction of the defendant is obtainable only by presenting facts equal to those which were present in *International*

*Shoe*, the present case would not be one in which jurisdiction could be obtained over the defendant because we do not here have systematic and continuous transaction of business. Such is not necessary. The opinion in *International Shoe* acknowledged that some single or occasional acts of the corporate agent could be sufficient contact depending on the nature and quality of the acts performed. The Court said that the criteria which make the difference between activities which justify the subjection of a corporation to a suit and those that do not "cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less." *Id.*, 66 S.Ct. at 159. Satisfying due process depends on the quality and nature of the activity in relation to the fair and orderly administration of the laws which it is the purpose of the due process clause to insure.

In *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Court upheld jurisdiction in California over a Texas insurance company whose only contacts amounted to the soliciting of *an* insurance policy in California, the sending of premium notices and the collection of premiums. A California statute subjected an insurance company doing business within the state with its residents to the jurisdiction of the California courts. It rendered such insurance companies amenable to suits in California. The Court said that a California court could entertain the suit and enter judgment against the International Life Insurance Company if the contract was delivered in California, premiums were mailed from there and the insured was a resident of that state when he died. The Court said:

> These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable. When claims were small or moderate individual claimants frequently could not afford the cost of bringing an action in a

foreign forum—thus in effect making the company judgment proof. Often the crucial witnesses—as here on the company's defense of suicide—will be found in the insured's locality.

*Id.* at 223, 78 S.Ct. at 201. State residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant state in order to hold it legally accountable. The case is significant because of its holding that due process can be satisfied even though the contact with the state is limited to one business transaction, namely, the sale and servicing of an insurance policy, and the litigation having its source in that insurance contract.

The case of *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), has value for comparison purposes. The controversy there was the relative rights to the corpus of a trust which had been established in Delaware by a settlor who later took up residence in Florida. There was litigation in Florida concerning this trust in which the Florida court held that the trust was invalid. Subsequent litigation took place in Delaware, the Supreme Court of which held that the Florida Supreme Court decision lacked binding force. The Supreme Court of the United States determined the conflict by holding that the Florida court lacked personal jurisdiction to render its decision with respect to the validity of the trust because the trustee was the party in interest and he had no relationship to Florida whatsoever. The Court through Chief Justice Warren said:

> . . . The application of that rule (contact with the forum State) will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Id.* at 253, 78 S.Ct. at 1240. Here again the court was faced with a single specific property relationship. Significantly this fact was not responsible for denial of jurisdic-

tion. Rather, it was the fact that the party in interest who could bring the trust under the jurisdiction of Florida courts was absent. The trust's lack of relationship to Florida turned the decision. The settlor's relationship to the trust was insignificant and thus incapable of activating Florida laws.

The Fifth Circuit in earlier cases has ruled that in a newspaper case somewhat more substantial contacts are needed than in other types of cases. Such a view is expounded in *New York Times Company v. Connor,* 365 F.2d 567, 572 (1966). In *Buckley v. New York Post Corporation,* 373 F.2d 175 (2d Cir. 1967), the contrary view is adopted. There the contact is measured within the guidelines of the Supreme Court decisions without regard to the fact that the cause when considered on its merits has First Amendment protections. Whether there is a First Amendment defense is to be determined when the case is tried and ought not as a matter of reason and logic affect the outcome of a personal jurisdiction question such as we have here.

Later Fifth Circuit cases such as *Curtis Publishing Company v. Golino,* 383 F.2d 586, 588, 589 (5th Cir. 1967), suggest that the Fifth Circuit is not at this time adhering to the early rule calling for weighing heavily the fact that the case is a First Amendment one in deciding whether the contacts are adequate. To hold as did the Fifth Circuit that the First Amendment has to be thrown on the scales as an added impediment in media cases gives to the media an additional arrow which is not appropriate in a determination as to whether the contacts are legally sufficient to constitute due process. But even if this element were to be placed on the scales, so to speak, at this time, there is a countervailing policy consideration that outweighs it. We refer to the extremely disadvantageous position that citizens of Wyoming would be placed in if we were to adopt the *Insull* approach. No matter what the extent of the defamation was by an out-of-state member of the media to a citizen of Wyoming, the latter would be remediless within Wyoming and would be forced,

as we have seen, to travel to the home of the newspaper in order to vindicate his reputation.

■ The *International Shoe* case teaches that the contacts must not be so insignificant as to violate traditional notions of fair play and substantial justice. It cannot be said that in the case at bar the contacts are, in the light of this standard, inadequate since the Los Angeles Times is shown to have had business contacts in Wyoming consisting of the sale of syndicated features to newspaper subscribers. It has, in addition, mailed solicitations to Wyoming newspapers and has solicited advertising in Wyoming. Its subscribers are minimal, five to eight copies of the newspaper were dispatched to subscribers in Wyoming of which three were sent to reference libraries, plus 23 copies of the newspaper were mailed to Wyoming on Sundays. On the other hand, this story was a special event. Three reporters were dispatched to Wyoming for the purpose of investigating and writing it. The story carried a Rock Springs, Wyoming dateline.

Unquestionably when the story was written and published it was foreseeable that it would be given substantial attention within the State of Wyoming since there was more reader interest there than in any of the other states. Thus it was no accident that it had substantial effect in Wyoming. So, then, the Times developed and prepared a story which had great reader interest, was colorful, explosive and capable of inflicting injury within Wyoming and which also was capable of producing litigation such as that which is before the court. The development of the story and the publication of it under these circumstances constituted the causing of tortious injury within the state.

It is interesting to note that the Fifth Circuit has recognized that the single publication rule did not have to affect jurisdictional statutes. *See Edwards v. Associated Press,* 512 F.2d 258, 264–65 n. 19. *See also Mattox v. News Syndicate Co.,* 176 F.2d 897, 905 (2d Cir. 1949). *Cf. Dominiak v. National Enquirer,* 439 Pa. 222, 266 A.2d 626–627, 42 A.L.R.3d 798 (1970), which explains the single publication rule.

Frequently the limited application of the single publication rule in *Insull* has caused state courts to adopt the multiple publication rule. *See Lewis v. Reader's Digest Association, Inc.,* 162 Mont. 401, 512 P.2d 702 (1973).

We are convinced that the so-called single publication rule does not and should not have the consequences which have been attributed to it by the *Insull* case.

Finally, it is our opinion that the single publication rule has not been adopted in Wyoming and is unlikely to be adopted. We are also of the opinion that even if it were law it would not result in precluding Wyoming citizens who are defamed by use of state publications from obtaining jurisdiction in Wyoming.

The admitted facts bring the case within subsection (iii) of the Wyoming Long-Arm Statutes. As a result we do not judge the case only on the basis of the limited number of papers delivered to Wyoming apart from the story. If that was the extent of the evidence the result might be different. Nor does the fact that a single transaction is the dominant factor detract from the conclusion that jurisdiction exists considering the quality and nature of the activity. Viewing the transaction as a whole, then, we conclude that the Los Angeles Times released a force which took effect in Wyoming and which with the other jurisdictional facts satisfies the minimum contact requirement.

\* \* \*

The third point advanced by appellants is the error of the court in refusing to defer a ruling on the defendant's motion to dismiss, which request was made by the plaintiffs in order to complete discovery relative to jurisdiction. The third point need not be taken up.

Accordingly, the judgment of the district court in dismissing as to Los Angeles Times Mirror is reversed. The cause is remanded with directions to the district court to reinstate this claim.