[Civ. No. 40801. First Dist., Div. Three. Apr. 12, 1978.]

DAVID McGUIRE, Plaintiff and Respondent, v.
LEHMAN L. BRIGHTMAN, Defendant and Appellant.

## COUNSEL

Marc D. Mezzetta for Defendant and Appellant.

Jonathan M. Rutledge and Karen L. Spelke for Plaintiff and Respondent.

## OPINION

**ANELLO, J.**\*—This is an appeal from a judgment ordering enforcement of a South Dakota libel judgment of $100,000 taken against appellant after his default in the South Dakota action.

The appeal before us is on an extremely abbreviated record. Neither party requested that the oral proceedings, if any, be transcribed. All we have before us is the clerk's transcript which contains all of the pleadings

---

\*Assigned by the Chairperson of the Judicial Council.

filed in the trial court, in addition to declarations of the parties in support of respondent's motion for a summary judgment.

The sole question on this appeal is whether the South Dakota judgment is the type of judgment of a sister state to which the courts of California are required under article IV, section 1 of the United States Constitution to give full faith and credit.

Appellant argues that the South Dakota judgment was null and void for lack of jurisdiction over him in that at no time did he ever do business or commit a tort in the State of South Dakota. United Native Americans, Inc., a codefendant in both the South Dakota and the California actions, failed to answer the California superior court complaint and a default was entered as to it, and it is not a party to this appeal.

Appellant Lehman Brightman is a resident of California and president of United Native Americans, Inc., a California corporation. In August 1971, he visited relatives in South Dakota for about 10 days. Though he was not in South Dakota on official business on behalf of United Native Americans (UNA), while there he gathered information for an article subsequently to appear in that organization's newspaper, The Warpath.

The article concerned the United States Public Health Service Hospital on the Rosebud Reservation in South Dakota. At that time, respondent McGuire was a resident of South Dakota and was a doctor and general medical officer at that hospital. He was one of the persons libeled by the article. It was written by appellant in San Francisco and published in The Warpath, a newspaper with a total paid subscription of 1193, from 1971 to 1973, 4.3 percent of which were South Dakota subscribers. The corporation had no other contact with South Dakota, no employees there, no office space, no advertising revenues from the state, and no sales of papers to distributors or wholesalers.

In January 1973, McGuire filed an action for money damages in the Circuit Court, Tenth Judicial District, State of South Dakota, County of Todd, naming appellant and United Native Americans, Inc., as defendants. Appellant was personally served in San Francisco. However, he never appeared in that action, and judgment against him was by default.

The South Dakota court made the following findings of fact:

"1.

"United Native Americans, Inc. is a corporation doing business in the State of South Dakota.

"2.

"United Native Americans, Inc. is the publisher of a newspaper called 'Warpath' and such newspaper has been circulated in the State of South Dakota and the County of Todd.

"3.

"On or about May of 1972 the defendants falsely and maliciously composed and published in a conspicious place in Volume 4, Number 8 of said newspaper an article entitled 'Investigation: Rosebud Hospital' concerning plaintiff in his profession which article is on file herein.

"4.

"Plaintiff is one of the persons referred to in said publication.

"5.

"Plaintiff served on defendants Notice of False and Defamatory Statements and Request for Retraction but defendants did not publish such a retraction in any subsequent issue of the newspaper.

"6.

"The statements in said publication were false, unprivileged, malicious, and libelous and made with the intent to injure plaintiff in his good name and credit in his profession and business, and to cause it to be believed that by reason thereof, he had become incompetent to discharge his duties in his profession.

"7.

"By means of the publication plaintiff has been injured in his good name and credit as a physician, and it has and will cast a strong stigma upon his standing as a physician and surgeon and will work greatly to his injury in procuring patients, practice, and employment in the future.

"8,

"By reason of the publication plaintiff has been damaged in the sum of one hundred thousand and no/100 dollars ($100,000.00).

"9.

"Defendants and each of them have been served with Summons and Complaint as appears from the returns of Service on file herein and have not answered or in any way appeared and are in default herein."

The South Dakota court made conclusions of law in almost the same wording as the findings of fact, and included therein that said court had jurisdiction over both the cause of action and the appellant, as well as the defendant United Native Americans, Inc.

The San Francisco Superior Court adopted in full the South Dakota court's findings and conclusions, but added the following findings of fact:

"1. Lehman L. Brightman is the president of United Native Americans, Inc.

"2. Lehman L. Brightman visited the State of South Dakota in August of 1971. While there, he used the opportunity of being present in South Dakota to gather information which he subsequently used in a libelous fashion against the plaintiff, a resident of the forum state.

"3. Lehman L. Brightman knew at the time he wrote the article that it would be distributed in the State of South Dakota, as 'The Warpath' had 10 subscribers in the State of South Dakota at the time of publication of the libelous article.

"4. The Court finds that the State of South Dakota properly held jurisdiction of this cause and of defendants Lehman L. Brightman and the United Native Americans, Inc., and in giving full faith and credit to the judgment of the South Dakota Court, hereby incorporates the Findings of Fact made [by that court, as set forth above]."

The San Francisco court also adopted the South Dakota conclusions of law, but added the following conclusions:

"1. The activity of Lehman L. Brightman in the forum state was essential to the cause of action for libel.

"2. Lehman L. Brightman willfully and purposefully did acts in the forum state which resulted in a cause of action for libel.

"3. The acts of Lehman L. Brightman were sufficient to establish the minimum contacts necessary for personal jurisdiction over Lehman L. Brightman so as to avoid violating due process.

"4. Lehman L. Brightman engaged in sufficient local activity and caused a consequence in the forum state to indicate a purposeful enjoyment of the benefits and protections of the forum state's laws.

"5. The Court finds that the State of South Dakota properly held jurisdiction of this cause and of defendants Lehman L. Brightman and the United Native Americans, Inc., and in giving full faith and credit to the judgment of the South Dakota Court hereby incorporates the Conclusions of Law made by [that court, as discussed above]."

## DISCUSSION

■ "It is well settled that once a valid judgment has been rendered it must be accorded full faith and credit by every other court within the United States even though the cause of action upon which the judgment was based is against the law and public policy of the state in which enforcement is sought. [Citations.]" (*Biewend* v. *Biewend* (1941) 17 Cal.2d 108, 111-112 [109 P.2d 701, 132 A.L.R. 1264]; *Sanpietro* v. *Collins* (1967) 250 Cal.App.2d 203, 207 [58 Cal.Rptr. 219]; Rest.2d Conflict of Laws, § 93.) However, it is also settled that a defendant in an action to enforce a foreign default judgment has the right to show that it is in excess of jurisdiction or is affected by fraud if those issues were not expressly litigated in the foreign state. (*Craig* v. *Superior Court* (1975) 45 Cal.App.3d 675, 680 [119 Cal.Rptr. 692], and cases cited therein.)

The South Dakota long-arm statute provides:

"Any person is subject to the jurisdiction of the Courts of this State as to any cause of action arising from the doing personally, through any employee, or through an agent, of any of the following acts:

"1. The transaction of any business within this State;

"2. The commission of any act which results in accrual within this state of a tort action . . . ." (S.D. Compiled Laws Ann. § 15-7-2.)

The South Dakota Supreme Court has interpreted the foregoing section as asserting "jurisdiction to the fullest extent permissible under the due process clause of the Fourteenth Amendment" thus making applicable the long line of federal cases beginning with *Internat. Shoe Co.* v. *Washington* (1945) 326 U.S. 310 [90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057]. (*Ventling* v. *Kraft* (1968) 83 S.D. 465 [161 N.W.2d 29]; *Graber* v. *Prelin Industries, Inc.* (D.S.D. 1974) 368 F.Supp. 1358, 1361; *Block Industries* v. *DHJ Industries, Inc.* (8th Cir. 1974) 495 F.2d 256, 259.)

■ The main thrust of appellant's argument is that the South Dakota court did not, under its long-arm statute, have jurisdiction over either appellant or the United Native Americans, Inc. Appellant argues that the sole basis for the South Dakota court concluding it did have jurisdiction was predicated on the erroneous assumption that defendants were "doing business" in that state, rather than on the basis that defendants "committed a tort" within the State of South Dakota. In other words, appellant's position is that the validity of the South Dakota judgment must be decided on whether or not defendants were "doing business" in that state, and neither the California trial court nor the appellate court should consider the question where the tort, if any, was committed because the South Dakota court made no finding as to that issue. We disagree.

We conclude that the South Dakota court's findings 3, 6 and 7, reasonably construed, reveal that jurisdiction was based in part upon commission of a tort in South Dakota. However, even assuming that the South Dakota court did not expressly or impliedly find jurisdiction on the basis of commission of a tort within the state, clearly the San Francisco trial court in its conclusions of law No. 2 (*ante*) unequivocally concluded that appellant had performed acts in South Dakota resulting in jurisdiction over a cause of action for libel.

The San Francisco court was not restricted to finding jurisdiction on the same basis utilized by the South Dakota court. Because of appellant's default in the South Dakota action, appellant had the right to try the jurisdiction issue in San Francisco (see *Baldwin* v. *Iowa State Traveling Men's Assn.* (1931) 283 U.S. 522, 526 [75 L.Ed. 1244, 1247, 51 S.Ct. 517]) and to show invalidity of the foreign judgment by evidence not before

the South Dakota court. (5 Witkin, Cal. Procedure (2d ed. 1971) Attack on Judgment in Trial Court, § 12, p. 3593; *Gagnon Co., Inc.* v. *Nevada Desert Inn* (1955) 45 Cal.2d 448, 457 [289 P.2d 466]; *Craig* v. *Superior Court* (1975) 45 Cal.App.3d 675, 680 [119 Cal.Rptr. 692].) By reopening the jurisdiction issue, appellant provided respondent with the right and opportunity to present other evidence and further legal bases for the South Dakota court's assertion of jurisdiction.

Under the above reasoning, we conclude that the decision of the trial court below must be upheld if the grounds for jurisdiction in the South Dakota court support either the theory of defendants "doing business" or having "committed a tort" within our sister state.

■   "Resolution of the issue whether a state may properly assert in personam jurisdiction over a non-resident defendant involves a dual inquiry. [Citation.] The first question is whether the state has by statute provided for the assertion of jurisdiction in the context of the situation under scrutiny. Assuming the initial inquiry is answered affirmatively, the question then arises whether the assertion of jurisdiction is constitutionally permissible." (*Rebozo* v. *Washington Post Company* (5th Cir. 1975) 515 F.2d 1208, 1211.) We find that under the facts and the law, both questions must be answered in the affirmative.

Appellant refers us to the latest expression on the law of jurisdiction in multistate libel actions (*Anselmi* v. *Denver Post, Inc.* (10th Cir. 1977) 552 F.2d 316) to show what is constitutionally permissible in this area. Appellant's reliance on this case is misplaced.

In the *Anselmi* case, two Wyoming politicians sued the Times Mirror Corporation and other defendants for an article appearing in the Los Angeles Times allegedly accusing them of criminal acts. The trial court concluded that the Times Mirror Corporation did not do business in Wyoming, finding also that the Wyoming long-arm statute required that for jurisdiction based on a tort, the acts must be performed within the state.

On appeal, the *Anselmi* court agreed with the trial court ruling that the defendant was not "doing business" in the state, but disagreed with its interpretation of the provision for jurisdiction over one "causing tortious injury by an act or omission in this state." It concluded that sending a defamatory statement into Wyoming and causing injury to a Wyoming

resident were sufficient for the invocation of jurisdiction under its long-arm statute.

Appellant relies upon *Anselmi* for its statement of agreement with the trial court that "this is not a 'doing business' set of facts." He ignores, however, the rest of the opinion, which cogently summarizes the law applicable to jurisdiction over defendants allegedly sending libelous materials into the state of residence of the plaintiff.

■ *Anselmi* is instructive in that it reveals the nature of the dual inquiry required into the validity of nonresident jurisdiction in a libel case. The first element of the inquiry focuses upon the statute under which jurisdiction is alleged to be established. In *Anselmi*, as here, the statute was one which authorized jurisdiction over one causing a tort within the forum state. But the applicability of that statute in a libel case depends upon resolution of the issue raised by the "single publication" rule, under which the tort of libel is said to have occurred only at the time and place of publication. If that rule is in effect in the forum state, the tort of libel occurs only in the state of "publication" and jurisdiction arguably may not be maintained in the state of the plaintiff's residence on the basis of the accrual of a tort action within that state. (See *Insull* v. *New York World-Telegram Corporation* (7th Cir. 1959) 273 F.2d 166.)

The court's first step in *Anselmi* was to examine Wyoming law. That examination revealed that Wyoming would probably not follow the single publication rule if the issue were presently raised. *Anselmi* took the further step, however, of asking whether, even assuming the single publication rule were applied in Wyoming, it would apply to preclude jurisdiction over out-of-state publishers sending libelous material into the forum state. Relying upon Judge Friendly's decision in *Buckley* v. *New York Post Corporation* (2d Cir. 1967) 373 F.2d 175, the changes made to the Restatement, and other authority, the *Anselmi* court concluded that whatever the single publication rule's value in preventing multiplicity of actions and almost endless tolling of the statute of limitations, it would be improperly applied if used to prevent suit in the state of the plaintiff's residence for libel appearing in a newspaper published in a distant state. This conclusion was further supported by the difficulty in reconciling use of the single publication rule with the long-arm statute for torts, since the essence of defamation is injury to the reputation of the plaintiff in his home area where he is known.[1]

[1] Why should the tort of defamation be said to take place only at the place of publication when the damages take place at the plaintiff's residence?

In 1953, Prosser recognized that "The significant limitation on the 'single publication'

We have been unable to find a decision applying South Dakota law in which the single publication rule has even been mentioned. Thus, we can only speculate concerning whether the South Dakota courts would apply the rule. However, it should be noted that South Dakota's long-arm statute is patterned after the Illinois Civil Practice Act and the South Dakota drafters specifically commented that the South Dakota statute should be given the same expansive interpretation intended by the draftsmen of the Illinois act and given by the courts of that state. (*Ventling* v. *Kraft, supra,* 83 S.D. 465 [161 N.W.2d 29].)

Illinois has adopted the Uniform Single Publication Act, restricting a slandered person to one tort action based upon any single publication, such as one edition of a newspaper, book or magazine, even though damages may have been suffered in another jurisdiction. However, interpreting that section in *Process Church of Final Judgment* v. *Sanders* (N.D. Ill. 1972) 338 F.Supp. 1396, the federal district court concluded that it was not intended as a limitation upon the state's long-arm jurisdiction. Since South Dakota's long-arm statute is to be interpreted as expansively as Illinois', it would seem to follow that even assuming South Dakota were to judicially adopt a single publication rule, it would not operate as a limitation upon that state's long-arm jurisdiction. Thus, the first inquiry is satisfied: The South Dakota long-arm statute provides for assertion of jurisdiction in the context of an out-of-state publication allegedly libelling a South Dakota resident.

■ Turning to the second inquiry, did appellant's contacts with South Dakota make assertion of jurisdiction over him constitutionally

---

rule . . . is that it does not cross a state line. There are surprisingly few cases that ever have faced the problem; but they are all agreed that, as to interstate defamation or invasions of privacy, the entry into a new state may create at least one new and distinct cause of action." (Prosser, *Interstate Publications* (1953) 51 Mich.L.Rev. 959, 964-965.)

It is also interesting to note that Judge Friendly's view was that the "single publication" rule historically was primarily concerned with multiplicity of suits rather than jurisdiction. At pages 320-321 of the *Anselmi* opinion, in discussing the *Buckley* case, the court stated: "The court, speaking through Judge Friendly, pointed out that the single publication rule had nothing to do with the place of filing the lawsuit. The Friendly opinion properly noted that this misconception was based on the old 'last event' rule enunciated in the first Conflicts Restatement and the old English case of *Duke of Brunswick* v. *Harmer, supra.* The Judge then went on to say that the single publication rule existed for the purpose of preventing multiplicity of suits and almost endless tolling of statute of limitations. The court said that these goals can be satisfied by holding that an injured plaintiff can collect his damages in one action, and so then held that there was no relationship to the exercise of personal jurisdiction over a claim arising at the place of the plaintiff's residence. The court went on to reject the doctrine on the ground that it was mechanical. The rule in the *Insull* case, it was pointed out, protected only the defendant and did not recognize the plaintiff's rights."

permissible? As mentioned above, the South Dakota long-arm statute is "intended to provide South Dakota residents with maximum protection of South Dakota courts from damages and injuries occasioned them through the acts or omission, both contractual and tortious, of a nonresident when that nonresident has had the necessary minimal contacts with the state to comply with federal due process." (*Graber* v. *Prelin Industries, Inc., supra,* 368 F.Supp. at p. 1361.) Thus, the question is whether appellant herein had sufficient contacts with South Dakota "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" (*Internat. Shoe Co.* v. *Washington, supra,* 326 U.S. 310, 316 [90 L.Ed. 95, 102]; *Rebozo* v. *Washington Post Company, supra,* 515 F.2d at p. 1213.)

In *Anselmi* v. *Denver Post, Inc., supra,* 552 F.2d at page 325, the following contacts with Wyoming were shown:

"[T]he Los Angeles Times is shown to have had business contacts in Wyoming consisting of the sale of syndicated features to newspaper subscribers. It has, in addition, mailed solicitations to Wyoming newspapers and has solicited advertising in Wyoming. Its subscribers are minimal, five to eight copies of the newspaper were dispatched to subscribers in Wyoming of which three were sent to reference libraries, plus 23 copies of the newspaper were mailed to Wyoming on Sundays. On the other hand, this story was a special event. Three reporters were dispatched to Wyoming for the purpose of investigating and writing it. The story carried a Rock Springs, Wyoming dateline.

"Unquestionably when the story was written and published it was foreseeable that it would be given substantial attention within the State of Wyoming since there was more reader interest there than in any of the other states. Thus it was no accident that it had substantial effect in Wyoming. So, then, the Times developed and prepared a story which had great reader interest, was colorful, explosive and capable of inflicting injury within Wyoming and which also was capable of producing litigation such as that which is before the court. The development of the story and the publication of it under these circumstances constituted the causing of tortious injury within the state." The *Anselmi* court held that those contacts were sufficient to satisfy the "minimum contacts" requirement explained by the United States Supreme Court in *Internat. Shoe Co.* v. *Washington, supra,* 326 U.S. 310; *McGee* v. *International Life Ins.*

*Co.* (1957) 355 U.S. 220 [2 L.Ed.2d 223, 78 S.Ct. 199]; and *Hanson* v. *Denckla* (1958) 357 U.S. 235 [2 L.Ed.2d 1283, 78 S.Ct. 1228] (552 F.2d at pp. 323-325).

The contacts in the case at bench were similar in many ways to those in *Anselmi.* Both defendant publishers had relatively small circulation in the forum state. But in each case the story was a local story of greater interest to residents of the forum state than to those elsewhere. In each case the story was based upon information gathered in the forum state. And in each it was foreseeable that the story would be given substantial attention in the state.

The differences between the cases are not so significant. Here the reporter did not enter the state for the purpose of gathering the story or at the direction of the publisher. And the publisher did not sell syndicated features within the state or solicit advertising in South Dakota. Further, only one reporter was involved here. However, appellant's purposeful gathering of information in South Dakota and publication of an article libeling a South Dakota resident, knowing that it would be disseminated in South Dakota, justified the South Dakota court's assertion of jurisdiction. (See *Rebozo* v. *Washington Post Company, supra,* 515 F.2d 1208; *Edwards* v. *Associated Press* (5th Cir. 1975) 512 F.2d 258; *Curtis Publishing Company* v. *Golino* (5th Cir. 1967) 383 F.2d 586.)

This conclusion is in accord with the Restatement Second of Conflict of Laws section 150, which declares that:

". . . rights and liabilities from defamatory material are determined by the local law of the state which has the most significant relationship to the occurrence, and subsection (2) declares that a significant relationship exists in the state where the party was domiciled at the time that the matter complained of was published in that state.

"Comment (e) of this section provides that when there has been a publication in two or more states of an aggregate publication claimed to be defamatory, at least most issues involving the tort should be determined by the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation and that this will usually be the state of the plaintiff's domicile." (*Anselmi* v. *Denver Post, Inc., supra,* 552 F.2d at pp. 321-322.)

■ Appellant argues that jurisdiction over him, to be distinguished from jurisdiction over United Native Americans, was not proper because he was only a reporter, not the publisher. This contention is unpersuasive.

The San Francisco proceedings constituted a new trial on the jurisdictional issue. By appellant's own admission in those proceedings he gathered the material and wrote the libelous article. The San Francisco court made findings to that effect, finding as well that appellant was the president of United Native Americans, Inc. Appellant has cited no authority for any contention that he may have that an author is not a proper defendant in an action for libel printed in a periodical. To the contrary, the general rule for defamation is that everyone who takes a responsible part in the publication is liable for the defamation. (See Prosser, Law of Torts (4th ed. 1971) § 113, p. 768.) And even if appellant could somehow avoid liability for his acts for United Native Americans, Inc., it would not follow that jurisdiction could not be maintained based upon those acts. Thus, it seems clear that appellant's status as the author instead of the publisher does not create a legal distinction invalidating jurisdiction over him. (See *Davis* v. *Superior Court* (1976) 62 Cal.App.3d 484 [133 Cal.Rptr. 115]; *National Life of Florida Corp.* v. *Superior Court* (1971) 21 Cal.App.3d 281 [98 Cal.Rptr. 435].)

We therefore hold that jurisdiction in South Dakota over appellant based upon commission of the tort of libel with effects accruing in South Dakota is statutorily and constitutionally justified.

Judgment affirmed.

Scott, Acting P. J., and Feinberg, J., concurred.

A petition for a rehearing was denied May 12, 1978, and appellant's petition for a hearing by the Supreme Court was denied June 9, 1978. Manuel, J., did not participate therein. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.