William **JANKLOW**, Plaintiff and Appellant,

v.

The **VIKING PRESS** and Peter **Matthiessen**, Defendants and Appellees.

No. 16778.

Supreme Court of South Dakota.

Argued March 19, 1990.

Decided July 18, 1990.

Charles Rick Johnson of Johnson, Eck-lund & Davis, Gregory, Brent A. Wilbur of May, Adam, Gerdes & Thompson, Pierre, Joseph M. Butler of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for plaintiff and appellant.

Lawrence L. Piersol and Timothy M. Gebhart of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee Peter Matthiessen.

Martin Garbus of Frankfurt, Garbus, Klein & Selz, P.C., New York City, Gerald L. Reade of Brady, Reade & Johnson, Yankton, for defendant and appellee The Viking Press.

DOBBERPUHL, Circuit Judge.

This is an appeal of a summary judgment against the plaintiff, William Janklow (Janklow), in favor of the defendants, Peter Matthiessen (Matthiessen) and Viking Press (Viking). The underlying action is based on libel. Janklow claims that Matthiessen, as the author, and Viking, as the publisher, included libelous statements within the book *In the Spirit of Crazy Horse*. We affirm.

## PROCEDURAL HISTORY

In May 1983 Janklow initiated this suit in South Dakota circuit court. Matthiessen and Viking joined to remove the case to federal district court. The district court remanded the case to the circuit court to determine the validity of the claim under state law. On remand Matthiessen and Viking filed motions to dismiss on grounds that the complaint failed to state a claim upon which relief could be granted. SDCL 15–6–12(b)(5). The dismissal was granted by the trial court.

The dismissal was appealed to this court in *Janklow v. Viking Press*, 378 N.W.2d 875 (S.D.1985). This court considered two issues: (1) did the trial court err in granting the defendants' motions under SDCL 15–6–12(b)(5); and, (2) is the neutral reportage doctrine applicable in defamation cases in South Dakota? This court held that the dismissal was unwarranted and that the neutral reportage doctrine would not be adopted in South Dakota. *Janklow, supra.*

After the dismissal was reversed, the circuit court decided to limit discovery to the issue of actual malice. After several years of intensive discovery, Matthiessen and Viking filed motions for summary judgment. The trial court granted the motions.[1]

## FACTS

Matthiessen's book was released for distribution by his publisher in the spring of 1983. Janklow alleges that there are portions of this book containing libelous statements in reference to him. The statements concern allegations of a rape, driving drunk while nude from the waist down, and shooting dogs while riding a motorcycle in the residential area of a reservation. Matthiessen admits that the book is not entirely objective; however, the purpose of the book is to promote the historical viewpoint of traditional Indians.[2]

---

1. The memorandum opinion of Circuit Judge Gene Paul Kean dated June 2, 1989, states:
   This evidence shows that the statements in the book concerning Janklow are not based upon fabrication by Matthiessen. Nor are they the product of his imagination, or based wholly on anonymous sources, or allegations so inherently improbable that only a reckless person would have published them. Matthiessen has shown that some individuals believe these statements reflect actual events, although several investigations have reached contrary results. As a result, actual malice cannot be proven by clear and convincing evidence.

2. The book reports on three distinct areas related to Indian history. The book reviews the history of Indian lands and treaties. Next, it discusses the development of the American Indian Movement (AIM). Finally, it focuses on the trial of Leonard Peltier for the murder of two FBI agents. Matthiessen does not hide his sympathies for AIM or Leonard Peltier. This compilation of work consists of over 600 pages in which Janklow is mentioned on approximately thirty pages. There is no doubt that Janklow is portrayed in a less than admirable light, but most portrayals of Janklow are merely opinions

The first allegedly libelous statement is the rape allegation by Jancita Eagle Deer. This passage states:

On January 14, 1967, according to delegates from the Rosebud Reservation, a fifteen-year old girl named Jancita Eagle Deer, who sometimes worked in the white community at Rosebud as a baby-sitter, reported to her school principal that she had been raped on her way home the night before by her employer, a young white lawyer named William Janklow who served as director of the tribe's Legal Services program. A complaint was made to a BIA investigator, who filed a report; the principal escorted the shocked girl to the hospital, where a doctor found evidence that an attack had occurred.

P. Matthiessen, *In the Spirit of Crazy Horse*, 108-09 (1983). Janklow claims there is no evidence that the doctor who examined Jancita Eagle Deer found any evidence of an attack. In support of his claim, Janklow relies on the examining doctor's deposition testimony.[3]

The second allegedly libelous statement is a quote attributed to Dennis Banks:

"I knew of Janklow as early as '70 or '71, from talks with the Rosebud Tribal Council leader; he told me that this Janklow had raped a young Indian girl while working down there for the legal service. Hell, that guy's bad name was floating around even before Custer. We had affidavits from two BIA cops on the Crow Creek Reservation who had picked him up for driving his car around dead drunk and nude. There was also sworn testimony that Janklow rode a motorcycle in a reservation residential area, shooting dogs."

*Crazy Horse*, at 110. Janklow contends that these statements have no foundation except for Dennis Banks' quote. He as-

serts that if Matthiessen had obtained the BIA affidavits and the sworn testimony referred to in Banks' quote, then the truth would be known. Janklow claims that Matthiessen's failure to investigate these matters shows actual malice on his part.

Finally, the third allegedly libelous statement is a passage quoting Russell Means, again relating to the rape allegation:

"I never knew the prejudice against Indians in this state!—that's what Bill [Janklow] told me. He was a great guy, humorous and fun to be with, and he had a lot of humanity. I remember Christmas 1967, when he dressed up as Santa Claus and he drove around in a blizzard delivering presents to the poorest people, the ones living in tarpaper shacks and tents and car bodies. He drank pretty heavy, and Indians were always dropping by his house to get some of his liquor, and I guess it was alcohol behind the rape of Jancita Eagle Deer. He did it, all right. I knew Jancita—that really ruined her life.... Janklow went from raping young girls to raping Mother Earth [referring to Janklow's support of the mining industry]."

*Crazy Horse* at 449. Janklow asserts that this is stated in a factual manner lending credibility to the claim.

## ISSUE

WHETHER THE TRIAL COURT CORRECTLY DETERMINED THAT THERE WAS NO GENUINE ISSUE OF MATERIAL FACT UPON WHICH A JURY COULD FIND ACTUAL MALICE BY CLEAR AND CONVINCING EVIDENCE?

## ANALYSIS

This appeal concerns a summary judgment against a public official on the merits

shared by some of the subjects of the book. Janklow's counsel argues that the number of pages is not as significant as the forum. A major publisher and award-winning author have the combined effect of legitimacy.

3. The doctor's deposition states:
Q: Doctor, referring you to page 109 of the book, and I would quote, "The principal es-

corted the shocked girl to the hospital where a doctor found evidence that an attack had occurred." Assuming you were the only doctor who examined her that day, what evidence, if any, did you find that an attack had occurred? A: As just stated, I answered this previously, I found no evidence based on my examination that there was injury.

of a libel suit. This is a case of first impression.[4] Significantly, this appeal presents issues concerning the standard of review and burden of proof in a libel suit at the summary judgment stage of a proceeding.

### A. Summary Judgment Standard

■ Summary judgment has been governed by the well known rules adopted in *Wilson v. Great Northern Railway Company*, 83 S.D. 207, 157 N.W.2d 19 (1968). Recently, however, the U.S. Supreme Court has sculpted an exception for libel suits brought by public officials and figures. This exception announces a different standard of review and burden of proof for a plaintiff in a libel suit. The exception is stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[5] *Anderson* concludes:

> [W]here the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a New York Times case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not. (footnote omitted).

*Anderson*, 477 U.S. at 255–56, 106 S.Ct. at 2514, 91 L.Ed.2d at 216. Clearly, the plaintiff has a much greater burden of proof, not only at the trial level, but at the summary judgment stage.

■ The trial court limited discovery to the issue of actual malice. This limitation was based on the necessity of actual malice for any recovery by a public official as noted in *New York Times, supra*, and *Hackworth, supra*. The first step is proving that there has been a publication of a false or defamatory statement with knowledge of its falsity or a reckless disregard for the truth. *Harte–Hanks, Inc. v. Connaughton*, 491 U.S. ——, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

### B. Reckless Disregard

This case focuses on the standards upon which there can be a finding of reckless disregard. Reckless disregard for the truth is incapable of definition within one concise statement. The following are several cases which provide helpful guides to determining the presence of a reckless disregard for the truth. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). Further, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* Not only must a defendant entertain serious doubts as to the truth, but the evidence must permit the conclusion that the defendant actually had a high degree of awareness of probable falsity. *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Finally, the reporting of a third party's allegations involves recklessness when, "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (footnote omitted). *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 268.

---

**4.** This court has considered other libel suits; however, their outcomes have been grounded on other reasoning. *See, Hackworth v. Larson*, 83 S.D. 674, 165 N.W.2d 705 (1969) (summary judgment granted on the basis of statutory absolute privilege); *Wollman v. Graff*, 287 N.W.2d 104 (S.D.1980) (judgment from jury verdict upheld on basis of facts); and *Janklow, supra*, (reversed a dismissal because the complaint stated sufficient grounds for relief).

**5.** Libel suits present different evidentiary standards because of the possibility that First Amendment rights may be infringed. This was recognized in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). South Dakota recognized the standard requiring proof in a libel suit by "clear and convincing" evidence in *Hackworth, supra.*

■ It is evident that there is no "bright line" rule upon which a determination of reckless disregard can be made. However, it is clear that the plaintiff in a libel suit must prove:

    (1) libel by clear and convincing evidence;

    (2) more than a defendant's failure to investigate;

    (3) that the defendant entertained serious doubts as to the truth;

    (4) that the defendant had a high degree of awareness of falsity; and

    (5) that the defendant had obvious reason to doubt the veracity of the informant or the accuracy of his reports.

The first guideline is mandatory. The others are closely related to each other and will often be used in conjunction with one another.

■ There is one other consideration in a libel suit when actual malice is a concern. A plaintiff may enter evidence which is probative of the defendant's state of mind prior to publication. *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). This may be done by a direct inquiry concerning the defendant's knowledge of falsity. *Id.*

■ Janklow argues that the trial court granted summary judgment because Matthiessen had found "someone" who supported what was printed in his book. Janklow claims that Matthiessen clearly failed to adequately investigate the allegations considering the credibility of his sources, referring primarily to Dennis Banks and Russell Means. The argument is alleged to follow the same line of reasoning found in *Harte–Hanks, supra.*

In *Harte–Hanks, supra,* a newspaper ran a story shortly before a judicial election, claiming that the challenging candidate was using "dirty tricks" in the campaign.[6] The story was based on an interview with a woman who had participated in a meeting with the challenger and claimed to have knowledge of certain facts which pertained to the campaign tactics of the challenger.[7] The challenger denied using "dirty tricks" and stated that he was only interested in helping an investigation which was taking place concerning the current judicial administration.[8] The newspaper story did carry the challenger's denials.

The newspaper interviewed a total of seven people concerning the meeting where "dirty tricks" were allegedly discussed. The woman who was accusing the challenger claimed that the meeting was to discuss "dirty tricks" while all the others interviewed denied the allegations. The newspaper story did not mention that six people claimed the story was false but only mentioned the accuser's statement and the challenger's denials. Further, the accuser's sister, who both the accuser and the challenger stated would clear up the whole story, was not interviewed. The newspaper never made any attempt to contact her for an interview or listen to the tape of the actual meeting when the "dirty tricks" were allegedly discussed.

The U.S. Supreme Court found in *Harte–Hanks, supra,* that the Court of Appeals was correct in upholding the *jury verdict* in favor of the challenging candidate. The court stated:

**6.** It was conceded by the newspaper that it did, in fact, support the candidacy of the incumbent. *Harte–Hanks, supra.*

**7.** The woman, Alice Thompson, was a party to a tape recorded meeting in which the current judicial administration was discussed. She did not talk much during the meeting except to add some details to her sister's extended discussion about the corruption of the court administration. Subsequently, a newspaper interview was arranged with the court administrator's attorney and the newspaper, shortly after the court administrator had resigned. Thompson claimed that the challenger's purpose for the tape recorded meeting was to confront the current administration and force them into resigning. Also, Thompson claimed that the challenger offered her and her sister a paid vacation in Florida, offered each a job, offered to set their parents up in a business, and offered to take them both out to a victory dinner at an expensive restaurant. *Harte–Hanks, supra.*

**8.** A grand jury was convened to hear witnesses discuss the practices of the current judicial administration. Thompson and her sister were two of the witnesses who testified before the grand jury. *Harte–Hanks, supra.*

Accepting the jury's determination that [the newspaper's] explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges. Although failure to investigate will not alone support a finding of actual malice, [citation omitted] the purposeful avoidance of the truth is in a different category.

*Harte–Hanks,* 491 U.S. at ——, 109 S.Ct. at 2698, 105 L.Ed.2d at 591. The facts show overwhelming evidence on one side of the story which should have given the newspaper serious doubts about the truth of the accuser's statement. One person's statement was given credibility over six others plus the fact that there was an actual investigation going on concerning the alleged corruption of the current administration. This was found to be "clear and convincing" evidence.

There is no overwhelming evidence on either side in this case. Janklow claims that further investigation would have cleared up the entire matter. However, Matthiessen's book is admittedly written from the viewpoint of the Indians, and the statements are accurate reflections of the beliefs of many as supported by affidavits and depositions in evidence. Janklow may discredit those beliefs, but he cannot deny they exist.

Furthermore, there is ample support for each of the statements made within the book. The trial court's opinion reflects this fact. Pertaining to the rape allegation, Janklow asserts that there is no proof that the doctor found evidence of an attack.

The trial court correctly dealt with this matter. Tribal Judge Mario Gonzalez's memorandum decision on Janklow's disbarment from the bar of the Rosebud Reservation supports Matthiessen's report on the rape allegation. Although Matthiessen wrote that a doctor found evidence of an attack, contrary to medical records, the difference is insignificant as the trial court noted. The inquiry in summary judgment is into the existence of a genuine issue of *material fact* and this fact is not material to the issue of actual malice.

Janklow further argues that there is obvious reason to have serious doubts about the veracity of Matthiessen's sources. First, Banks and Means have obvious motives to defame Janklow. Second, Banks and Means were both convicted felons. Third, Janklow claims that even Matthiessen admits Banks and Means are unreliable and could not substantiate their statements. Fourth, South Dakota attorneys who reviewed the book prior to its publication warned Matthiessen and Viking about the possibility of libel.

These are all proper considerations to cause doubt about the veracity of a source. Banks and Means, however, were not the only sources which Matthiessen relied upon. As the trial court pointed out:

> By no means are the statements concerning Janklow in *In the Spirit of Crazy Horse,* a reckless publication about a public official. Defendants have provided evidence to support the statements in a lengthy affidavit by Matthiessen, accompanied by several exhibits totaling over 1200 pages.

Based upon our review of the evidence, this statement is correct[9] and this court is un-

---

**9.** There is supporting evidence available for each statement complained of by Janklow. Matthiessen lists his sources for each statement as follows:

> *Statement 1:* Doctor's finding supports evidence of an attack—Tribal Judge Gonzalez's decision (even though there is a slight variation).
> *Statement 2:* Driving drunk while nude from the waist down—Direct quote of Dennis Banks; sworn testimony of Robert G. Philbrick, who investigated in his capacity as Tribal Chairman of the Fort Thompson Indi-

an Agency; Robert Burnette testified before the U.S. Senate as the President of the Rosebud Sioux Tribe of South Dakota; and a written statement by Timothy Big Eagle, one of the arresting officers, supports that Janklow was drunk.
> *Statement 3:* Riding a motorcycle through a reservation residential area shooting dogs with a gun. Tribal Judge Gonzalez's decision; affidavit of Larry Leveuthal, an attorney, supporting that the statement accurately reflects the sworn testimony from Matthew War Bonnet, Sr., an eyewitness of this alleged incident;

der a duty to make an independent review of the evidence in full. *Harte–Hanks, supra; New York Times, supra.*

Janklow raises four other arguments which are unpersuasive. First, that Matthiessen did not make the faintest attempt to get the actual facts by obtaining public records. Second, that Matthiessen was obviously aware of the commercial value of a story containing a seamy revelation of a rape by a prominent public figure. Third, that the notes from the libel read show reliance by the defendants on the defense of the public figure standard. Finally, that Matthiessen and Viking knowingly portrayed him in the worst possible light by making numerous derogatory references to him in the book.

■ Janklow's first argument presupposes that his version of the events is the only true version. While it is not this court's duty to determine the truth, it may determine where it might be found. Matthiessen had ample support for the statements he printed. *See infra,* note 9. Although Janklow claims that certain public records were never sought by Matthiessen which would have provided the "truth," Matthiessen did unsuccessfully attempt to obtain these documents. Matthiessen's lack of success does not show a reckless disregard for the truth. Further, these documents, even if obtained, would have only presented a different view and conclusion of the facts Matthiessen already knew. Matthiessen also relied heavily on Tribal Judge Gonzalez's opinion which is afforded as much weight as any other public record.[10] Finally, Matthiessen goes beyond just printing these statements. He adequately points to the background of his sources and their motives as well as to conflicting evidence.

and the same account was printed in the books *Wasi' Chu: The Continuing Indian Wars,* by Bruce Johansen and Robert Maestas in 1979.

10. A tribal court opinion is entitled to full faith and credit through comity. *See, e.g., Hayes v. Barringer,* 168 F. 221 (8th Cir.1909). Matthiessen had every right to afford the tribal court opinion the same weight as any other public record.

■ Janklow's second argument is without merit because the profit motive would implicate malice in almost every spoken or written statement. A rape allegation against a public figure may represent a "seamy revelation," yet it does not violate any legal principles if it is accurately reported. Here, there is no dispute over the fact that the rape allegation was made. With one exception, Matthiessen reports only that a rape allegation was made and never charged.[11] "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from New York Times to Hustler Magazine would be little more than empty vessels." *Harte–Hanks,* 491 U.S. at ——, 109 S.Ct. at 2685, 105 L.Ed.2d at 576.

Janklow's last two arguments concern Matthiessen's and Viking's state of mind. Janklow claims they were aware that the statements were libelous because the "galley notes" allegedly show reliance on the public figure defense.[12] Similarly, he contends that the book's characterization of him as a "persecutor" and a known "Indian fighter" evinces malice.

The contention that Matthiessen and Viking knew of the possible libelous nature of the statements is well founded. However, they were also aware of the existence of evidence adequately supporting each potentially libelous statement with credible and reliable sources. Therefore, although there may have been knowledge of potentially libelous statements, there was also knowledge that they were supported by adequate evidence.

### C. Opinion/Fact Determination

■ Janklow further asserts that a jury could make a determination of malice from all of the comments made when taken

11. The exception will be dealt with later in this opinion.

12. There may be a factual question as to who wrote the notes mentioning the public figure defense or when they were noted. However, this evidence is not relevant since the statements are supported by ample sources.

as a whole. In other words, he claims the book goes well beyond the protections afforded to opinion. Opinion is protected even if it may be false. *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. (footnote omitted).

*Gertz,* 418 U.S. at 339–40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805.

There are references throughout the book, in addition to those listed earlier, which Janklow considers defamatory. In one part of the book there is a discussion of an FBI investigation of the Eagle Deer rape allegation which states that it was "speedily smoothed over" by the FBI. In matters relating to AIM, the book notes that Janklow "crowed" statements to reporters and "like so many of Janklow's utterances, this one seemed designed to cause more trouble." These are representative of the comments in the book complained of by Janklow as being additional evidence of actual malice and defamation. The most significant statement is Russell Means' quote which infers that Janklow actually raped Jancita Eagle Deer.

The Eighth Circuit Court of Appeals has adopted a four factor test to attempt to separate statements of fact from opinion. The four factors of the test are specificity or precision of a statement, verifiability, literary context and public context. *Janklow v. Newsweek, Inc.,* 788 F.2d 1300 (8th Cir.1986).

The application of the first factor was adequately described in *Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1432 (8th Cir.1989):

> The precision and specificity with which an assertion is made may reflect the extent to which it actually recites specific factual events. Specificity also goes to the singularity of a statement's meaning. Where a statement or phrase is suscepti-

ble of more than one meaning, we will not presume either that the phrase means what the plaintiff asserts it does or that it is factual where it can be understood as an opinion. *Letter Carriers [v. Austin,* 418 U.S. 264, 283–84, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1974)].

While the statements in question are less than flattering, they do not rise to the point where only one singular meaning or interpretation can be determined. Certain comments are nothing more than adjectives. Other statements can be viewed with numerous connotations. Thus, there is a lack of specificity.

The second factor, verifiability, is clearly the area where most of the comments and statements fall. Russell Means cannot verify that Janklow actually raped Jancita Eagle Deer. Further, Means does not make any specific detailed account of facts which would lead a person to believe his statement is factual. "If a statement cannot plausibly be verified, it cannot be seen as 'fact.'" *Janklow,* 788 F.2d at 1302. In *Price* it was stated:

> Where quantification for a general assertion is impossible, allowing any fact-finder to decide its truth or falsity invites the exercising of personal dispositions regarding "the contents of the statement, its author, or its subject." *Ollman [v. Evans,* 750 F.2d 970, 981 (D.C.Cir.1984) cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985)].

Specificity and verifiability thus function as limits on majoritarian bias and government intervention.

*Price,* 881 F.2d at 1432.

The third factor reviews the literary context of the forum. "Various considerations include cautionary or qualifying language, language or style which signals opinion, the type of publication, the location of the statement or work within the publication, and the intended audience." *Id.* This book hides nothing in the sense that plentiful background concerning the sources and their motivations are recorded. The sympathetical tone towards Indians is very evident and should warn the reader, as does

the author, to be critical of some sources. This backdrop sets the scene for many opinionated statements.

Finally, the book is considered in its public context. *Crazy Horse* is a book which proposes governmental misconduct in dealings with Indians from the time treaties were drawn to the present day. It can be honestly stated that this is a controversial topic. There has always been debate over the early treatment of Indians by the U.S. government. In this context, Janklow claims he has been targeted by *Crazy Horse*. This claim may not be false, however, public officials are often subject to scrutiny. The First Amendment protects the high value of public debate about government and its officials. *Ollman, supra.*

Many of the details recounted in *Crazy Horse* came out in Janklow's race for the South Dakota Attorney General's office. These statements are a part of the history of the political events which led to Janklow's election. It is difficult to conceive of a forum any more public than a political campaign.

### Conclusion

The trial court granted summary judgment in favor of defendants Matthiessen and Viking. Janklow was a public official at the time of publishing. The burden of proof is actual malice by "clear and convincing" evidence which rests on Janklow. Janklow failed to meet this standard against either Matthiessen or Viking. The statements are amply supported by credible, reliable sources. Further, the majority of the complaints are opinion as even Janklow's brief partially recognizes. We affirm the ruling of the trial court and its reasoning.

MORGAN, Acting C.J., and TALBOTT and GERKEN, Circuit Judges, concur.

HENDERSON, J., dissents.

DOBBERPUHL, Circuit Judge, for WUEST, C.J., disqualified.

TALBOTT, Circuit Judge, for SABERS, J., disqualified.

GERKEN, Circuit Judge, for MILLER, J., disqualified.

HENDERSON, Justice (dissenting).

Former Attorney General and Governor of this state is asking for a jury trial. Nothing more, nothing less. For some time, now exceeding six years, he has attempted to bring his case before a jury to have a determination of an alleged wrong perpetrated upon his character by printed defamation. His effort has been studied, labored and persistent to get his case before a jury. It is an odyssey in search of justice through the jury system. A circuit court has ruled that he should get no jury trial and this Court now rules likewise. In 1985, this Court reversed a trial court dismissal and remanded this case to the trial court for further proceedings. I would reverse the trial court again and remand this case for trial to a jury so that our former Governor would be given his constitutional right to a trial by jury and because there are genuine issues of material fact.

We, on this Court, are not bound by factual determinations of the trial judge. Our posture is to conduct an independent review of the record. This I have done, and I am shocked that former Governor Janklow is being denied a jury trial. It seems because he has been a public figure that the Appellees took the position that they could print anything about him to destroy him as a public figure without checking into the true facts. Derogatory comment about our former Governor abounds in this book in question and is then spiced with allegations of rape, drunkenness, nudity and violence. In my opinion, these hostile and defamatory remarks transcend the protections afforded to "opinion" and at least establish a question of fact for a jury to determine if Governor Janklow has been defamed. *Cianci v. New York Times Publishing Center*, 639 F.2d 54 (2nd Cir.1980), at 69.

Let us observe but a few of the allegations against Governor Janklow, as printed: (1) A case against Janklow was "speedily

smoothed over" by the FBI; (2) Janklow was a "self-proclaimed Indian fighter"; (3) Janklow received "the full support and financial endorsement of the energy corporations" and became the instrument, in state government, who abolished the Department of Environmental Protection; (4) Radiation contamination in South Dakota existed and the Janklow government was "not eager to hunt down the precise sources." Instead of being denominated as a "prosecutor" of a certain convict, he was labeled as a "persecutor." That a clear inference was made that Janklow raped a 15 year old girl (although there was no physical evidence whatsoever to establish a rape assault) and although a White House and United States Senate investigation thoroughly examined the rape charges and concluded that those charges were "unfounded" [1]; and (5) That Governor Janklow supposedly shot dogs, while riding a motorcycle; and drove his vehicle on the Reservation in a state of nudity.

Needless to say, this book was sensational. Appellees admit that the book was biased against Janklow. And further admit that publication of the book was to make money, if you will, for a profit. In the name of fundamental fairness, our former Governor is entitled to his constitutional right of a jury trial. How far can any journalist or writer go in printing horrible things about a public figure and then hide behind the First Amendment and/or "sources?" A convict was quoted, in the book, as expressing "Janklow went from raping young girls to raping Mother Earth." This is not an expression of "opinion"; this statement is factual in nature. The trial court held that such a statement was "opinion." Matthiessen wrote, with reference to the alleged rape, that the convict expressed, in fact, that Janklow "did it, allright." In other words, the Appellees have taken the words of convicts and printed them but refused to check out the White House and United States Senate investigation. Is that fair? Of course it is not! Is

it defamation? Answer: A jury should decide.

I find it laughable, if this were not such a serious case, to characterize this book establishing a "historical viewpoint of traditional Indians." Traditional Indians are decent people who love their culture and their families. They are not oft-times convicted felons with long histories of crime and violence. Matthiessen's main source of quotes and "historical viewpoints" came from these convicts. Mind you, Janklow was our former Attorney General who prosecuted these very convicts. Did Appellees act with a reckless disregard for the truth or did they have a high degree of knowledge of the statements' probable falsity? It is a question of fact for a jury.

Under *Ruane v. Murray*, 380 N.W.2d 362, 364 (S.D.1986), as the nonmoving party, Janklow presented facts, quite extensively, that a genuine, material issue existed for a trial. When we review a summary judgment, the nonmoving party, namely Janklow, is entitled to have the evidence viewed in a light most favorable to his position. The moving party, Viking Press, et. al., bear the burden of showing the essence of genuine issues of material facts. *Bego v. Gordon*, 407 N.W.2d 801 (S.D. 1987). So many times, this Court has expressed that summary judgment is *"an extreme remedy to be awarded only when the truth is clear."* Why, then, do we not inculcate precedential vitality?

> The right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy, but the Legislature may provide for a jury of less than twelve in any court not a court of record and for the decision of civil cases by three-fourths of the jury in any court.

S.D. Const. Art. VI. § vi.

By judicial fiat we should not erode constitutional rights. As a reader of law, on these summary judgment cases, I am struck with this thought: What is a "mate-

---

1. This is a public document and Matthiessen made no effort to obtain it. Does this not create a *question of fact* as to whether there was a reckless disregard of falsity or truth to the rape charge? No man or woman, trained in the law, could deny that a duty was owed to determine what this public document expressed.

rial fact"? In *Lyman v. Jennings*, 637 P.2d 259, 261 (Wyo.1981) it expresses: "A [material fact] ... is one which would have effect of establishing or refuting essential element of cause of action or offense asserted by parties." This Court has looked at Federal Rule 56(c) which expresses that "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). SDCL 15-6-56(c) is a verbatim resuscitation of Federal Rule 56(c). In my opinion, this Court violates our decision in *Wang v. Wang*, 447 N.W.2d 519, 521 (S.D.1989) wherein we expressed: "Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied."

A public figure may recover damages for a defamatory falsehood only through clear and convincing proof that the false statement was made with actual malice—that is, with knowledge that it was false *or* with a reckless disregard of whether it was false or not. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964). In *New York Times*, the United States Supreme Court independently examined the evidence in the record, which included a full trial, verdict, and judgment entered in favor of a defamation plaintiff. The Court determined that the plaintiff could not prove actual malice with "convincing clarity." Here, Janklow has never been given a trial before a jury. He has never been given a chance to go up to the plate and hit the ball, i.e., prove up a cause of action before a jury. The trial court fails to honor our precedent.

More recently, the Supreme Court had occasion to address this issue in *Liberty Lobby*. In that case, the Supreme Court held that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." Thus, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.* Janklow should be given an opportunity to meet that evidentiary burden before a jury for, indeed, he has established a material issue of fact on whether Appellees printed with a reckless disregard for the truth or printed with a high degree of knowledge of the statements' probably falsity.

Initially, even taking into account the clear and convincing burden of proof, I would hold that a genuine issue of material fact exists here. The Appellees have failed to meet their initial burden by demonstrating that no genuine issue of material fact exists with respect to actual malice. The voluminous record contains many factual scenarios which indicate, to a considerable extent, that the Appellees published certain statements and accusations creating a question of fact for a jury regarding their truth. Former Governor Janklow answered, under oath, 58 Appellees' interrogatories, wherein he refuted the numerous allegations against him contained in the book; he set forth witnesses who would testify as to the falsity of the allegations. More particularly, he referred to a deposition of Dr. John Crockett which establishes that the allegation of rape against Jancita Eagle Deer was extremely dubious in light of the fact that there was no physical evidence demonstrating a sexual assault upon her on the day in question by Janklow or any other person.

This writer will now address the actual malice issue. Evidence of either deliberate falsification *or* reckless publication is essential to recovery in public official defamation cases. Reckless disregard may be shown where the defendants have made a false publication with a high degree of awareness of probable falsity, *or* must have entertained serious doubts as to the truth of his publication. *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

Reckless conduct is not measured by whether a reasonable prudent person would have published or would have investigated before publishing; *rather, there must be sufficient evidence to conclude that the defendant in fact en-*

tertained serious doubts as to the truth of its publication.[2] *Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.*

*Id.* (Emphasis supplied mine).

The standard for determining "actual malice" is subjective, focusing on the defendant's belief in *or attitude toward the truth of a statement,* not the defendant's personal hostility toward the plaintiff. *St. Amant, supra.* However, actual malice can be inferred from circumstantial evidence, including defendant's hostility[3] or spite, the reporter's knowledge that his sources are hostile to the plaintiff or ignorant of the details concerning the situation and failing to properly investigate. *Herron v. King Broadcasting Co.,* 109 Wash.2d 514, 746 P.2d 295 (1987) *citing Tavoulareas v. Piro,* 759 F.2d 90, 134–35 (D.C.C.Cir.1985).

Essentially, the Appellees argue that Matthiessen made an extensive investigation and used reliable sources to confirm the accuracy of his reports.[4] Therefore, a jury could not find, by clear and convincing evidence, that Appellees acted with reckless disregard for the truth. I disagree. Here, viewing the evidence in the record in a light most favorable to Janklow, there is considerable circumstantial evidence of actual malice. We must go back to our old rule in *Wilson v. Great Northern Ry. Co.,* 83 S.D. 207, 212, 157 N.W.2d 19 (1968) that the evidence must be viewed most favorably to the nonmoving party and reasonable doubts must be resolved against the moving party.

Matthiessen knew that his main sources of information (Banks and Means) were biased against Janklow. He was aware that both men were convicted felons, one of whom (Banks) had been convicted after a jury trial at which Janklow was a prosecutor. Matthiessen apparently chose to ignore this fact, both in the investigation and in the publication of his book. He made only a slight effort to seek verification concerning the truth of their claims against Janklow. Obviously, Appellees should have entertained serious doubts about the truth of the publication in regards to the information received by Matthiessen's main sources. The Appellees requested that a number of attorneys review the book for factual accuracy. They were warned by two of the attorneys that the book libeled Janklow and that they were subjecting themselves to possible claims by Janklow. I am not saying this. Warnings by these attorneys, as demonstrated by the evidence before the trial court, were made to Appellees. In effect, Appellees said "fine, we have your warning but we are going to publish anyway." The Appellees did not attempt to obtain the actual facts of the incident by reading documents which were of public record (the United States Senate transcript) or by contacting Janklow. Moreover, Appellees were money oriented and obviously aware of the commercial value of their story of "a seamy revelation of rape by a prominent public figure." In addition, the general tenor of almost every reference to Janklow is hostile and portrays Janklow in the worst possible light.

Moreover, South Dakota has in its Bill of Rights:

Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right. In all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense. The jury shall have the right to determine the fact and the law

---

2. It is patent that a question of fact exists whether Appellants had serious doubts concerning the truth of the publication. Exhibits on file reflect that lawyers advised Appellees that the book contained libelous material. Appellees failed to contact one of the attorneys, failed to contact two "BIA cops" and did not make any effort to substantiate the statements of the two convicts; nor did Matthiessen contact BIA or FBI agents.

3. Depositions on file clearly reflect that the reporter absolutely knew that his sources were hostile to Janklow.

4. Sworn testimony reflects that Matthiessen was in South Dakota for approximately two days. Was that the truth? A jury should decide how "extensive" his investigation was.

under the direction of the court.[5] S.D. Const. Art. IV § 5. Uniquely, in South Dakota, there is a constitutional right to a trial by jury to determine the facts and the law under the direction of the court in a libel case. No judicial declaration by this Court should take away that constitutional right.

Recently, the United States Supreme Court determined that the First Amendment does not prohibit a state's application of its own libel laws relating to matters of public concern. In *Milkovich v. Lorain Journal Co.*, — U.S. ——, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), petitioner Milkovich was a high school wrestling coach at Maple Heights High School in Maple Heights, Ohio. In 1974, his team was involved in an altercation at a home wrestling match with a team from a rival high school. In response to the incident, the Ohio High School Athletic Association (OHSAA) held a hearing at which Milkovich testified. Following the hearing, his team was put on probation. Thereafter, several parents and wrestlers sued OHSAA, seeking a restraining order against OHSAA's ruling on the grounds that they had been denied due process in the OHSAA proceeding. Milkovich testified in that proceeding also. The day after the county court overturned OHSAA's ruling, Lorain Journal Company's newspaper published a column authored by Respondent and Mr. T. Diadiun, which implied that Milkovich lied under oath in the judicial proceeding. Milkovich subsequently commenced a defamation action against the respondents. Ultimately, the trial court granted summary judgment for respondents. The Ohio Court of Appeals affirmed. The United States Supreme Court reversed and remanded. The Supreme Court's judgment was based in part on the

grounds that the article constituted an "opinion" and that the First Amendment does not require a separate "opinion" privilege limiting the application of state defamation laws. The Court further held that the First Amendment does not prohibit application of Ohio's libel laws to the alleged defamation contained in the article.

The Supreme Court stated in Milkovich: "The dispositive question in the present case then becomes whether or not a reasonable factfinder could conclude that the statements in the Diadiun column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding. We think, this question must be answered in the affirmative." *Id.* In the present case, the question becomes whether or not a reasonable factfinder could conclude that the many statements in this book imply assertions that Janklow actually did all of the outlandish acts referred to, including raping a young Indian girl on a South Dakota Indian Reservation.

"The numerous decisions discussed above [in Milkovich] establishing First Amendment protection for defendants in defamation actions surely demonstrate the Court's recognition of the Amendment's vital guarantee of free and uninhibited discussion of public issues. But there is also another side to the equation: we have regularly acknowledged the 'important social values which underlie the law of defamation,' and recognize that '[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.' *Rosenblatt v. Baer*, 383 U.S. 75, 86 [86 S.Ct. 669, 676, 15 L.Ed.2d 597] (1966). Justice Stewart in that case put it with his customary clarity:

5. Appellees, in their Table of Authorities, cited S.D. Const. Art. VI § 4 expressing the following: The right of petition, and of the people peaceably to assemble to consult for the common good and make known their opinions, shall never be abridged. However, they believe and argue that their opinions and statements have no limit. The limit is set forth above which is that, indeed: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Janklow is guaranteed, constitu-

tionally, a right to a jury trial for alleged libel and this Court takes it away from him. Woodrow Wilson, in an address on July 4, 1914 stated: "Liberty does not consist in mere declarations of the rights of man. It consists of the translations of those declarations into definite actions." You can mouth the constitution until the cows home, but if you do not breathe life into it, and turn it into a definite action, it becomes a lifeless embodiment of words—weak by neglect.

'The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.

The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.'

*Id.*, at 92–93 [86 S.Ct. at 679–80] (Stewart, J., concurring)."

How can the South Dakota Constitution be either unconstitutional or subservient to a decision by judges or justices? The words in our Constitution are very express and mandatory. We do not need the United States Supreme Court to interpret our own state constitution. That is within our province. We have the right to grant greater rights under our state constitution than those bequeathed unto us by the Federal Constitution. *State v. Flittie*, 425 N.W.2d 1 (S.D.1988); *State v. Opperman*, 247 N.W.2d 673, 674–675 (S.D.1976); *citing Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *State v. Neville*, 346 N.W.2d 425, 427–428 (S.D.1984), rev'd on other grounds, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). Janklow has not cited the above South Dakota constitutional provision in his brief either. This Court has interpreted this constitutional provision in *Brodsky v. Journal Publishing Co.*, 73 S.D. 343, 42 N.W.2d 855 (1950). Clearly, that case stands for this proposition: "If a publication alleged to be libelous is susceptible of different interpretations, one of which is defamatory and the other not, a question for jury is presented." I have shepardized this case and it has been cited with approval in *Groseth Intern., Inc. v. Tenneco, Inc.*, 410 N.W.2d 159 (S.D.1987). *Brodsky* has never been overruled in this state and it is still good law. *Brodsky* and this constitutional provision should be our polestar in analyzing the academic merits of this appeal.

In conclusion, I would find that Janklow has at least presented a genuine issue of material fact in regards to whether Appellees acted with actual malice in publishing the book in question. I would reverse and remand for a trial. I am reminded, as I lay down my pen, of the words of Napoleon Bonapart who said: "I fear one printing press more than 10,000 bayonets."